**Lisa MATURO, Plaintiff,**

v.

**NATIONAL GRAPHICS, INC., Nicholas Napoli, Robert Anderson, and Harold Peters, Defendants.**

**Civ. No. N–87–311 (TFGD).**

United States District Court, D. Connecticut.

May 19, 1989.

On Pending Post–Trial Motions Sept. 6, 1989.

Karen Lee Torre, Williams & Wise, New Haven, Conn., for plaintiff.

Joseph Garrison, Garrison, Kahn, Silbert & Arterton, New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION

DALY, District Judge.

Plaintiff brings the above-captioned action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[1] She claims that, while in the employ of defendant National Graphics, Inc. ("National Graphics"), she was the victim of repeated sexual harassment and assaults. Furthermore, she alleges that she was compelled to leave her job with National Graphics because of the continuing harassment and the refusal of defendants to take any action to end the harassment. The case was tried to the Court on April 24–27, 1989.

## FINDINGS OF FACT

The testimony at trial of plaintiff, on the one hand, and the individual defendants, on the other, is sharply contradictory. Thus, in making its findings, the Court must assess and weigh the credibility of the various witnesses. In doing so, the Court finds that, as between plaintiff and the individual

---

**1.** Plaintiff's complaint originally also alleged pendent state law claims for assault, battery, and intentional infliction of emotional distress. On plaintiff's consent, trial of the claims were bifurcated by order dated July 7, 1988, with the Title VII claims to be tried first. On the eve of trial, plaintiff for the first time raised an objection to the bifurcation and requested that the Title VII portion of the case be tried after the state law claims, which had been claimed to a jury. In light of the substantial lapse of time since the bifurcation ruling and the likelihood of a significant further delay in the disposition of the matter if the case were continued and the jury claims tried first, the Court concluded that it was in the best interests of the parties and the administration of justice to proceed with the Title VII portion of the case, and the pendent state law claims were dismissed. *See Bouchet v. National Urban League,* 730 F.2d 799, 805–06 (D.C.Cir.1984).

defendants, only plaintiff's testimony is worthy of credit. In fact, not only does the Court find that plaintiff's testimony is credible, internally consistent, and better supported by the evidence and testimony of impartial witnesses—for example, that of Sgt. Delfino—but that the rendition of the events surrounding plaintiff's claims given by the individual defendants is simply undeserving of belief or credence. The individual defendants' testimony conflicted with each other on critical factual questions. Moreover, the demeanor of the individual defendants while testifying, when contrasted to that of plaintiff, supports the conclusion that plaintiff's testimony merits belief. On the basis of this determination, the Court makes the following findings of fact.

National Graphics is a printing company located in North Branford, Connecticut. Plaintiff was employed at National Graphics, except for periodic involuntary layoffs resulting from work slowdowns, from 1983 until 1986. Beginning in 1984, she worked as a folder operator in the bindery department. While employed at National Graphics in 1986, plaintiff earned $6.00 per hour. She was due for a $.50 pay raise in the summer of 1986. The number of hours she worked per week varied, ranging from forty hours a week to nearly sixty hours a week depending upon the amount of business. She routinely worked Saturdays and more often than not her work week averaged approximately fifty hours.

Defendant Napoli is the president, chief executive officer, and sole stockholder of National Graphics. As stipulated at trial, National Graphics and Napoli are employers within the meaning of 42 U.S.C. § 2000e(b). Defendant Anderson was, during the relevant time period, a manager at National Graphics with supervisory authority over the plant, including the bindery department. Defendant Peters was, during the relevant period, employed as a folder operator and a lead man with supervisory authority over plaintiff.

The layout of the National Graphics plant was such that five folding machines were lined up along one wall. Five printing presses were lined up along a second wall. When in operation, the machines, and especially the presses, were quite noisy. Anderson had a desk on the plant floor against the wall behind the presses.

Peters was hired as a folder operator in 1984 at roughly the same time plaintiff began working as a folder operator. Plaintiff and defendant Peters operated folding machines that were located next to each other. Not long after he was first hired, Peters began making sexually explicit remarks and inquiries to plaintiff. For example, he asked about her sex life and whether there was anything he could do to help her, indicating his interest in having sex with her. Plaintiff responded to these unsolicited questions by stating that she was not interested and requesting that he leave her alone. These comments and questions continued through the end of 1984.

The remarks eventually became increasingly vulgar and aggressive in nature. By 1985, despite plaintiff's continued rejection of his inquiries, Peters was subjecting her to a stream of comments in starkly graphic language about his desire to have oral and anal sex with her and describing the various sexual positions in which he would like to engage her. The remarks intensified during the later part of 1985 to the point where he made such comments nearly every work day.

The oral harassment often increased on pay days. On those days, Peters usually left the building to cash his paycheck and to have lunch. At lunch, he would drink an alcoholic beverage of one sort or another. When he returned to work, his sexual comments to plaintiff would become more violent and insistent, often continuing in a constant stream of offensive remarks for fifteen minutes at a time.

At some point in early 1985, Anderson informed plaintiff that Peters had been made her supervisor. Anderson also told her that if she had any problems with her machine that she should go to Peters for assistance. Napoli also confirmed that plaintiff should seek Peters' assistance on the machine. In addition to having to go to Peters for assistance with the operation of

the folding machine, Peters, as her supervisor, assigned her to various tasks. On various occasions after being made her supervisor, Peters told plaintiff that if she pleased him sexually, he could obtain pay raises and vacation time for her and he would assist her on learning how to operate the folding machines better. Similarly, after becoming her supervisor, he invited plaintiff to go on a "love weekend" with him during which they would have sex and in return for which he would secure certain job benefits for her. On those occasions when plaintiff needed assistance with her machine and, as instructed by Anderson, went to Peters for aid, Peters either refused to help her or asked her what she was going to do for him.

Faced with this continuing harassment from 1984 and on through 1985, plaintiff was offended and felt extremely embarassed and humiliated. On many occasions, plaintiff left her machine to get away from Peters. In fact, one day she felt forced to leave work altogether to avoid the onslaught of abuse from Peters. Moreover, she became frightened of Peters, not only because of the often aggressive nature of the oral harassment, but also because of his supervisory authority and the threat she felt that he might be able to cause her to lose her job.

National Graphics had no formal complaint or grievance procedure. Nor did it have an expressed policy against sexual harassment. Nonetheless, plaintiff complained to Anderson about the oral harassment as early as the latter part of 1984 and continued to complain throughout 1985. In addition, she complained to Napoli. Neither Anderson nor Napoli took any serious action in response to the complaints about the oral harassment. After plaintiff on various occasions told both Anderson and Napoli of the harassment and that she was tired of it, their only reply was that they would speak to Peters. While they apparently did speak to Peters about plaintiff's complaints sometime before 1986, their actions were ineffective and insufficient inasmuch as the harassment not only continued but intensified through 1985 and into 1986.

The harassment eventually escalated to physical assaults. On January 16, 1986, while plaintiff was standing next to her folding machine and talking with co-worker Michael Delfranco, Peters came up from behind plaintiff, grabbed her arms, and pulled her close up against his body. While holding her in such a way so that she was unable to free herself, he said that he wanted to "screw" her, reached around, and grabbed and fondled her left breast. He then released her, and walked away laughing. Plaintiff felt shocked, upset, and humiliated. She went to the restroom for approximately fifteen minutes to try to collect herself. She then went to Anderson and reported the incident to him. Anderson's response was that she should have come sooner, but that he would speak with Peters about it. Anderson did question Peters about plaintiff's allegation. Peters denied having done anything, and Anderson did not pursue the matter any further.

Peters assaulted plaintiff a second time. On February 13, 1986, Peters asked her to join him on a "love weekend." Plaintiff rejected the offer, and he reached out and roughly grabbed and fondled her breast. She immediately went to Anderson and told him that Peters had grabbed her breast and that she wanted to see Napoli. A meeting was then held in Napoli's office at which Napoli, Anderson, plaintiff, and Peters were present. At the meeting, plaintiff told Napoli that Peters had grabbed her breast. Napoli asked Peters about the incident, and Peters denied plaintiff's allegations. Instead, Peters maintained that all he had done was to poke her in her side. He attempted to demonstrate this by approaching plaintiff and showing how he poked her. Napoli questioned Peters about how he would feel if someone sexually assaulted him. Peters response was to grab his groin and to say to Napoli, "Go ahead Nick, I'd love it." Peters subsequently left the meeting, and Napoli asked plaintiff what she wanted him to do, to which she replied that it was not her decision to make. However, she did tell Napoli that she was not satisfied with his apparent inaction and that she felt compelled to go

to the police. Napoli responded that he was behind her one hundred percent. Peters was then recalled into the office and was told by Napoli to stay away from plaintiff.

On February 17, 1986, plaintiff went to the North Branford Police Department to file a complaint against Peters, and was interviewed by Sgt. John Delfino. She was accompanied by Michael Delfranco, who made a written statement to Sgt. Delfino as an eyewitness. In his subsequent investigation, Sgt. Delfino contacted Napoli by telephone. Napoli told Sgt. Delfino that he was familiar with plaintiff's complaints, that the company had done an investigation of its own, and that he would turn over to Sgt. Delfino the written records of that investigation. Despite several further inquiries from Sgt. Delfino, Napoli never produced any records or documents. Thereafter, Sgt. Delfino secured and served upon Peters a warrant for his arrest on two counts of sexual assault in the fourth degree.

Despite her complaints to Anderson and Napoli and despite his arrest, National Graphics continued to employ Peters and had him work as a folder operator along side plaintiff. Although the oral harassment subsided for a short period after the February 13, 1986 meeting, it started up once again, accompanied by veiled threats aimed at frightening plaintiff to drop the criminal charges. On several occasions, plaintiff asked Napoli to take some kind of action to end Peters's offensive conduct. Napoli stated that he would not fire or suspend Peters, that the only thing he could think of doing was to put up a wall or partition between their machines, and that maybe she should take a two-week leave.

Finally, while working on a Saturday at the end of March, 1986, during which Peters was yet again orally harassing her and making sexually offensive remarks, plaintiff could take no more. She ran out of the factory extremely emotionally upset and did not from that point on return to work. By certified letter sent April 11, 1986 and received April 15, 1986, plaintiff informed Napoli that, in light of the management's continued refusal to provide a suitable working environment, she felt she could no longer work under such intolerable conditions at National Graphics. She also indicated her interest in returning to work at National Graphics if assured that she would be free from sexual harassment. Napoli never replied to the letter.

Plaintiff suffered serious emotional difficulties as a result of the harassment at National Graphics, difficulties which continue to the present.[2] She became depressed, had trouble sleeping and eating, and withdrew from her friends and family. Moreover, she suffered from nightmares and a high level of anxiety and stress as well as a general feeling of being unsafe. Because of these emotional difficulties, she was unable to maintain a normal level of daily function. In April, 1988, plaintiff began counseling and has since begun to overcome some of her emotional problems.

Because of her depression and other emotional problems resulting from her experiences at National Graphics, she remained unemployed for approximately six months after leaving her job there. She nevertheless began looking for new employment, and at the end of September, 1986, she secured a job at a gift shop. At this job, she was initially paid a salary of $225 per week. Later, in October of the same year, she received a raise to a salary of $250 per week. Because of her dissatisfaction with that job, which was at least in part related to her emotional condition, she left it in late December, 1986. She again began looking for new employment, and at the end of January, 1987, she secured a position with Lester Telemarketing, Inc. She worked at Lester Telemarketing through sometime in February, 1988 and

2. Defendants objected at trial and in their post-trial briefs to the testimony of plaintiff's therapist, Barbara Moynihan, about rape trauma syndrome. Inasmuch as the other credible evidence supporting the finding that plaintiff was sexually harassed and assaulted is overwhelming, the Court need not even consider the testimony about rape trauma syndrome at least with regard to the issue of whether plaintiff was in fact harassed. The therapist's testimony, however, is relevant to and probative of the issue of plaintiff's emotional state.

earned between $7.00 and $7.20 per hour. She left this job because of her inability to cope with the stress related to the job, and her inability to cope was a direct result of her emotional problems caused by the harassment at National Graphics. Finally, in late November, 1988, she obtained a job as a veterinary assistant at approximately $7.00 per hour. She continues to hold that position at the present.

By letter dated November 5, 1987, National Graphics offered to reinstate plaintiff unconditionally, noting that Peters would not be her supervisor. However, the reinstatement offer did not indicate that plaintiff would be ensured of a workplace free from sexual harassment. In light of the history of harassment by Peters, who continued to work at National Graphics, and the management's failure to take any effective measures to end the harassment, plaintiff rejected the offer of reinstatement.

Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunties ("CHRO") and the Equal Employment Opportunities Commission ("EEOC"). At the time, she was not yet represented by counsel, and the complaints were not drafted with the assistance of counsel. However, a staff member of the CHRO aided plaintiff in drawing up the CHRO complaint. Even though the CHRO complaint listed only National Graphics and Napoli as respondents, all defendants were aware of and had seen a copy of the CHRO and EEOC complaints. Plaintiff subsequently received a right to sue letter from the EEOC in April, 1987, and thereafter brought this action.

### CONCLUSIONS OF LAW

■ Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). When an employer or supervisor sexually harasses a subordinate employee, the employer or supervisor has discriminated against that employee on the basis of sex. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Moreover, such harassment need not be related or linked to any economic *quid pro quo.* Rather, sexual harassment that is sufficiently severe or pervasive to alter the employee's working conditions and to create an abusive or hostile environment alone violates Title VII. *Id.* at 65–67, 106 S.Ct. at 2404–06. Sexual comments or advances constitute harassment if they are unwelcome. *Id.* at 68, 106 S.Ct. at 2406.

Plaintiff was subjected to both oral and physical sexual harassment by Peters. The oral harassment spanned a period of two years. This harassment, which culminated in not one, but two physical attacks on plaintiff's body, made plaintiff's working conditions at National Graphics unbearable. Peters' inexcusable conduct transformed the National Graphics plant from a workplace to a place of sexual violence and discrimination. Yet, Napoli and Anderson effectively did nothing, despite having been notified on numerous occasions of plaintiff's complaints and entreaties for some kind of effective response. Their simple unwillingness to address and correct the unacceptable situation under which plaintiff was compelled to work not only permitted the hostile environment to exist and continue, but in fact contributed to its intensification. Their failure to intervene appropriately at an early stage after plaintiff's initial complaints implicitly indicated to Peters that his conduct would go unpunished by the company. Moreover, their refusal to take corrective action reflected an extraordinary insensitivity to sexual harassment and the potential harm—not only to the employee but also to the effective functioning of the workplace—stemming from it.

■ This lack of assistance by Napoli and Anderson in ending the sexual harassment ultimately lead to plaintiff's decision that she could no longer work under such conditions. The conditions under which plaintiff worked were " 'so difficult or un-

pleasant that a reasonable person in [her] shoes would have felt compelled to resign.'" *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (quoting *Alicea Rosado v. Gracia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)). The deliberate inaction of Napoli and Anderson resulted in the creation of a work environment so openly hostile that plaintiff's decision to leave National Graphics constituted a constructive discharge. *Id.; see also Martin v. Citibank, N.A.,* 762 F.2d 212, 221 (2d Cir.1985). Similarly, given the discriminatory working conditions and management's unwillingness to correct them, National Graphics' offer of reinstatement, which was made after the commencement of this lawsuit and which lacked any serious pledge ensuring plaintiff that she would not be subjected to further sexual harassment, was little more than an empty gesture. Plaintiff's rejection of the reinstatement offer was, under the circumstances, eminently reasonable.

■ Although there appears to be some uncertainty in the law with regard to an employer's potential liability for a supervisory employee's discriminatory conduct of which the employer had no notice or knowledge, *see Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408, there is no question about the liability of the instant defendants. National Graphics and Napoli are employers under Title VII. Anderson had broad managerial authority in terms of the supervising, disciplining, and firing of employees, and was second in command only to Napoli on the plant floor. Because of this broad grant of authority, Anderson acted as an agent of National Graphics and Napoli. Peters also performed supervisory functions, including assigning tasks and instructing plaintiff on the operation of the folding machine. Furthermore, plaintiff was instructed by Anderson that Peters was her supervisor. Peters himself played up the aura of authority bestowed upon him by Anderson and Napoli by suggesting that, in return for sexual favors, he could obtain pay raises and other job benefits for her. Peters was therefore not a mere co-worker. He had actual and apparent supervisory authority over plaintiff, and he used that authority to further his harassment of plaintiff. Given the substantial actual and apparent authority wielded by Peters, he was an agent of his employers. *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1418 (10th Cir.1987) (citing *Restatement (Second) of Agency* § 219(2)); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1559 (11th Cir.1987) (same).

■ Napoli and Anderson had on numerous occasions been notified by plaintiff of Peters discriminatory conduct. Although they had been made aware of the harassment, they made no reasonable efforts to correct the situation. Thus, Napoli and National Graphics, as employers, are liable under Title VII on two separate theories. First, they are vicariously liable for the discriminatory conduct, of which they had notice, by Peters, a supervisor and agent of National Graphics. *Hicks,* 833 F.2d at 1418; *Sparks,* 830 F.2d at 1559–60; *Yates v. Avco Corp.,* 819 F.2d 630, 634 (6th Cir. 1987). Second, National Graphics and Napoli, as well as Anderson, are liable for their own failure to take reasonable corrective measures to eliminate the hostile work environment in which plaintiff was compelled to work. *Swentek v. USAir, Inc.,* 830 F.2d 552, 558 (4th Cir.1987); *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422 (7th Cir.1986). Finally, Peters, as an agent of National Graphics, is liable for his harassment of plaintiff. *See* 42 U.S.C. § 2000e(b) (including in the definition of employer any agent of the employer).

■ Plaintiff filed a complaint with the Connecticut CHRO. She also filed a complaint with the EEOC, which incorporated by reference the CHRO complaint, and obtained a Notice of the Right to Sue from the EEOC. Generally, an action under Title VII can proceed only against those individuals named as respondents in the complaint filed with the EEOC. 42 U.S.C. § 2000e–5(f)(1). The purpose of this exhaustion requirement is to provide notice to those alleged to have committed the violations and to provide an opportunity for the parties to comply voluntarily with the requirements of Title VII. *Alvarado v.*

*Board of Trustees of Montgomery Comm. College,* 848 F.2d 457, 461 (4th Cir.1988); *Garcia v. Gardner's Nurseries, Inc.,* 585 F.Supp. 369, 373 (D.Conn.1984). A limited exception to the exhaustion requirement permits an action against a party not named as a respondent in the EEOC complaint if the underlying dual purposes of the exhaustion requirement are otherwise satisfied. *Alcena v. Raine,* 692 F.Supp. 261, 269 (S.D.N.Y.1988). Specifically, the factors to be considered under this exception are

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Garcia,* 585 F.Supp. at 369 (quoting *Glus v. G.C. Murphy Co.,* 562 F.2d 880, 888 (3d Cir.1977), *vacated and remanded on other grounds,* 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981)).

■ Plaintiff's complaint filed with the CHRO and by incorporation with the EEOC listed only National Graphics and Napoli as respondents. However, all three individual defendants herein had actual notice of the complaint. The CHRO complaint also identified Peters as the harasser. Neither Anderson nor Peters suffered any substantial prejudice from the lack of formal notice. For purposes of voluntary conciliation, the interests of Anderson and Peters were in fact substantially identical to that of National Graphics and Napoli. Furthermore, the appearance of an identity of interest between Peters and National Graphics was fostered by Peters' representations of authority over plaintiff. Finally, the Court recognizes not only that plaintiff was not represented by an attorney at the time she submitted the CHRO complaint, but also that she was assisted in its drafting by CHRO personnel. Under these circumstances, the Court concludes that the underlying purposes of providing notice and encouraging conciliation were satisfied and that plaintiff should not be barred from proceeding because of a technical failure in the filing of her CHRO and EEOC complaints.

■ In terms of relief, plaintiff seeks backpay.[3] Title VII permits the award of backpay for up to two years prior to the filing of the EEOC complaint. 42 U.S.C. § 2000e–5(g). However, Title VII imposes on plaintiff a duty to mitigate, requiring any interim earnings and amounts earnable through reasonable diligence by plaintiff to be set off against the backpay otherwise awardable. *Id.; Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982).

When plaintiff left National Graphics at the end of March, 1986, she was being paid at a rate of $6.00 per hour. She would have received a raise of $.50 per hour at the beginning of the summer. Therefore, plaintiff is entitled to backpay, less reasonable mitigation, at an hourly rate of $6.00 before June, 1986, and at an hourly rate of $6.50 thereafter. On the average, she worked fifty hours per week. During the approximately six month period beginning at the end of March, 1986, plaintiff was unemployed and unable to obtain other work because of the depression and emotional debilitation resulting from the sexual harassment. Beginning at the end of September, 1986 and ending in late December, 1986, plaintiff worked at a gift shop. Her weekly salary at the gift shop was at first $225. She obtained a raise to $250 per week in October. After leaving the gift

---

**3.** Plaintiff would also be entitled to immediate reinstatement. Although her complaint seeks such relief, her post-trial briefs appear to indicate that she has withdrawn her claim for reinstatement.

shop, she made reasonable efforts to obtain a new job. In January, 1987, plaintiff began a job at Lester Telemarketing that paid more than that which she would have made at National Graphics. However, she was compelled to leave that position in February, 1988 for reasons directly related to the emotional injuries sustained from the sexual harassment at National Graphics. She remained unemployed and unable to work because of her emotional injuries until she secured her present position late November, 1988. Her efforts during these periods to secure alternative employment constituted reasonable diligence to mitigate her damages. Moreover, her inability to work during those periods in which she was unemployed was the direct result of defendants' actions. She will not be penalized for failing to seek or to secure employment during those times.

Based upon these findings, plaintiff is entitled to backpay calculated as follows: For the nine-week period beginning March 30, 1986 and ending May 31, 1986, plaintiff is entitled to backpay at a weekly rate of $300. For the seventeen-week period from June 1, 1986 to September 27, 1986, plaintiff may recover backpay at a weekly rate of $325. For the three-week period from September 28, 1986 to October 18, 1986, plaintiff is entitled to backpay of $125 per week. For the nine-week period beginning October 19, 1986 and ending December 20, 1986, plaintiff may recover backpay at a weekly rate of $100. For the five-week period from December 21, 1986 to January 24, 1987, plaintiff may recover backpay at a weekly rate of $325. Finally, for the thirty-nine-week period commencing February 28, 1988 and ending November 26, 1988, plaintiff may recover backpay at $325 per week. The total backpay award is $23,800.[4]

In addition, because the purpose of Title VII remedies are to "make whole" the plaintiff, she is entitled to prejudgment interest on the backpay award. The prejudgment interest shall be calculated using the interest rates set forth in § 6621 of the Internal Revenue Code. *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 572 F.Supp. 494, 495 (D.Conn.1983). Plaintiff shall submit for approval by the Court a proposed schedule setting forth the prejudgment interest calculation within ten days hereof.

Finally, plaintiff, as a prevailing party, is entitled to an award of attorney's fees and costs expended in connection with this matter. 42 U.S.C. § 2000e–5(k). Plaintiff shall file her application for fees and costs within ten days hereof.

Judgment shall enter accordingly.

SO ORDERED.

## ON PENDING POST–TRIAL MOTIONS

After trial on April 24–27, 1989, the Court found defendants liable for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Defendants have moved for a new trial pursuant to Fed.R.Civ.P. 59(a).[1] In addition, presently pending are plaintiff's proposed schedule for prejudgment interest and application for attorneys' fees.[2] Familiarity with the prior proceedings is presumed.

## DEFENDANTS' MOTIONS FOR NEW TRIAL

### I. *Backpay Award*

The Court awarded plaintiff a total backpay award of $23,800. Defendants challenge the Court's findings and conclusions relating to the backpay award on several grounds. Their first challenge is

---

**4.** Plaintiff received $1,500 in unemployment compensation during 1986. That amount is not offset against the backpay award as mitigated damages. *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 82–85 (3d Cir.1983); *Brown v. A.J. Gerrard Manuf. Co.*, 715 F.2d 1549, 1550 (11th Cir.1983).

**1.** Defendants National Graphics, Napoli, and Anderson had originally filed both a motion for new trial on damages and a motion for new

trial on liability. On June 16, 1989, they withdrew the latter motion, indicating they did not intend to raise any issues regarding liability on appeal. Defendant Peters's motion for new trial raises issues on liability and damages.

**2.** The Court notes that defendant Peters has failed to submit a timely objection to the proposed schedule of prejudgment interest or to the application for attorneys' fees.

that plaintiff's rejection of the reinstatement offer of November 5, 1987 ended the accrual of any backpay liability. Because the statutory framework of Title VII seeks voluntary compliance as its primary mechanism for ending discrimination in employment, *see Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974), reinstatement offers by employers are encouraged. Therefore, absent "special circumstances," an employer's accrual of backpay liability is ended by an employee's rejection of an unconditional offer of reinstatement. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 241, 102 S.Ct. 3057, 3070, 73 L.Ed.2d 721 (1982).

■ Defendants argue that there are no special circumstances in this case to justify plaintiff's rejection of the reinstatement offer. The offer was unconditional and stated that Peters would not be her supervisor. Nevertheless, Peters continued to work at National Graphics. Nor was there any representation that National Graphics would take any measure to ensure that plaintiff would be able to work free of future harassment.

The Court cannot agree with defendants' contention that there are no special circumstances warranting plaintiff's rejection. Indeed, to require Maturo to accept reinstatement would be not only inequitable but cruel. Plaintiff was subjected to a long history of harassment by Peters, with whom plaintiff, given the relatively small workforce at National Graphics, would undoubtedly come in contact on a recurring basis if she returned to National Graphics. Moreover, Napoli and Anderson had displayed an utter lack of concern about the harassment. The reinstatement offer would have had plaintiff working in relatively close proximity to her assailant without any reasonable assurance that she could trust the management to protect her from abuse or assaults. No person could work under such conditions with any peace of mind. Because of the extraordinary level of harassment and hostility on the part of Peters and the complete inaction on the part of Napoli and Anderson, an employment relationship between plaintiff and de-

fendants quite simply could not be reestablished. Therefore, the Court reaffirms its original finding and conclusion that plaintiff's rejection of the offer of reinstatement does not preclude recovery of backpay after the date of offer.

■ Defendants also attack the Court's decision not to include as mitigation the unemployment compensation received by plaintiff. The Second Circuit has held that it is not an abuse of discretion to offset against any Title VII backpay award sums received from collateral sources such as unemployment compensation. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 47 (2d Cir.1980); *EEOC v. Enterprise Ass'n Steamfitters Local No. 638*, 542 F.2d 579, 591–92 (2d Cir.1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). The court left open the possibility that, in certain cases, such an offset would not be appropriate. *See Enterprise Ass'n Steamfitters*, 542 F.2d at 592; *Sims v. Mme. Paulette Dry Cleaners*, 638 F.Supp. 224, 231 (S.D.N.Y.1986). In the context of the circumstances of this case, the Court concludes that it would be inequitable to deduct from the backpay award the amount of unemployment compensation plaintiff received after her constructive discharge from defendants' employment. The relatively small amount of unemployment compensation received by plaintiff—$1,500—is more properly understood in the light of the facts of this case as assistance in seeking and obtaining new employment, rather than as a remedy for the injury of illegally losing her prior employment and the income derived therefrom. *Meschino v. International Tel. & Tel. Corp.*, 661 F.Supp. 254, 260 (S.D.N.Y.1987). The decision not to deduct the unemployment compensation from the backpay award is not intended nor does it have the effect of providing plaintiff with double compensation or of imposing a punitive award against defendants. Rather, it properly directs the backpay award toward making plaintiff whole. In its discretion, therefore, the Court concludes that the unemployment compensation should not offset the backpay award. *See Bonura v. Chase Manhattan Bank*,

*N.A.*, 629 F.Supp. 353, 361 (S.D.N.Y.), *aff'd,* 795 F.2d 276 (2d Cir.1986).

■ Defendants also attack the Court's calculation of the backpay award on the grounds that it is against the weight of the evidence and that, properly viewed, the evidence demonstrates that plaintiff failed to mitigate her damages. First, defendants argue that plaintiff left her position at the gift shop in late December, 1986 voluntarily and therefore is not entitled to backpay during the short period thereafter in which she was unemployed. On the basis of the evidence produced at trial, the Court disagrees. Plaintiff testified that a major consideration in her decision to leave the gift shop was that she was being required to work nights and that she did not want to work those hours. The Court finds that her discomforture with working after dark was directly related to and proximately caused by the sexual harassment at National Graphics. Moreover, her feelings of unease are entirely consistent with the other emotional difficulties she displayed throughout the period after the harassment. A plaintiff is not required to accept just any employment as mitigation under Title VII. *Ford Motor Co.*, 458 U.S. at 231, 102 S.Ct. at 3065 ("[C]laimant need not go into another line of work, accept a demotion, or take a demeaning position...."). When a plaintiff has taken reasonble measures to obtain employment but is unable to acept or continue the employment because of injuries inflicted by her former employer, she has sustained her duty to mitigate.[3]

Defendants make a similar argument about the Court's finding that plaintiff left her job at Lester Telemarketing for reasons connected with her emotional injuries. The credible evidence is plaintiff's trial testimony, bolstered by the testimony of her therapist. She was unable to cope with the stress of the job at Lester Telemarketing. Her inability to handle the stress inherent in that job was directly related to and proximately caused by the emotional trauma from the harassment. Plaintiff's decision to quit her employment with Lester Telemarketing does not constitute a failure to undertake reasonable mitigation.

■ At trial, defendants sought to call an officer of Lester Telemarketing as a witness. The Court granted plaintiff's motion to preclude the witness on the grounds that defendants had violated the pretrial order by failing to timely disclose the witness. Defendants contend that this was error because this witness was a rebuttal or impeachment witness and because they had no notice prior to trial that plaintiff would claim that she left Lester Telemarketing because of reasons connected with the sexual harassment. The decision to preclude, on the basis of the record at trial, was proper. Defendants carry the burden of proving that plaintiff failed to exercise reasonable diligence in seeking equivalent employment in mitigation of her damages. *Proulx v. Citibank, N.A.*, 681 F.Supp. 199, 203 (S.D.N.Y.), *aff'd mem.*, 862 F.2d 304 (2d Cir.1988); *EEOC v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919, 924–25 (S.D.N.Y.1976), *aff'd mem.*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Therefore, the proposed witness was not merely a rebuttal or impeachment witness, but rather a witness whose testimony went to the crux of an issue on which defendants had the burden. Such a witness must be listed in a party's pretrial memorandum in accordance with the Court's pretrial order. *See Pretrial Order* (March 8, 1988).

---

**3.** In addition, the Court finds that defendants have failed to establish that the job at the gift shop was substantially equivalent to plaintiff's position with National Graphics. *See Ford Motor Co.*, 458 U.S. at 232, 102 S.Ct. at 3066; *Bonura*, 629 F.Supp. at 356. The gift shop job paid substantially less, was entirely unrelated to the operation of the folding machines at National Graphics, and ultimately would have required plaintiff to work evenings. The duty to mitigate does not preclude a plaintiff from leaving employment that she has voluntarily undertaken that is not substantially equivalent to her position with her former employer. *Sellers v. Delgado Community College*, 839 F.2d 1132, 1137 (5th Cir.1988); *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1511 (11th Cir.1987); *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234–35 (7th Cir.1986). Therefore, plaintiff shall not be penalized for having left the gift shop job.

Moreover, defendants claim that they lacked notice of plaintiff's claim that she left Lester Telemarketing because of her emotional difficulties is unsupportable. At the very least, they were in a position after the deposition of plaintiff's therapist, which the Court, on March 21, 1989, permitted defendants to take long after the discovery deadline had passed, to give plaintiff adequate notice of their intention to call a witness from Lester Telemarketing. Defendants did not notify plaintiff until the Thursday evening before trial commencing the following Monday, April 24, 1989, indicating little more than an apparent attempt to prejudice plaintiff unncessarily.

Furthermore, defendants overstate the importance and relevance of the proposed testimony of this witness. Taking defendants proffer on its face, there is no necessary contradiction between plaintiff's testimony and that which would have likely been given by an officer from Lester Telemarketing. Plaintiff quit her job at Lester Telemarketing. She apparently did not articulate her reasons to her supervisor at Lester Telemarketing as having been related to an emotional inability to cope with the stress of the job. She apparently at that time did not even understand or identify her problems in this way. That understanding only developed after lengthy therapy.

Reopening the record to take the testimony of this one witness may appear to defendants to be a simple thing. However, the witness was originally precluded because defendants' conduct had been prejudicial to plaintiff. Defendants' present attempt to reopen the trial to bring on this witness would do little more than further delay the just recovery of an exceptionally aggrieved plaintiff. The Court can find no reason to justify such a result.

Defendants also attack the Court's reliance on the testimony of plaintiff's therapist, suggesting that the testimony of plaintiff and the therapist conflicted. Their position is unavailing. To the extremely limited extent that their testimony conflicts, any such inconsistencies are entirely understandable. Plaintiff, as a layperson, has a somewhat different understanding of and different manner of communicating her emotional troubles than would a trained therapist. Furthermore, as the one who has suffered the trauma, she had some discernable difficulty in testifying about those troubles. The Court can identify no contradictions of real substance between plaintiff's and the therapist's testimony that in any fashion would alter the Court's findings.[4]

Finally, defendants contend that the Court's finding that plaintiff on average worked 50 hours per week at National Graphics is unsupported by the record. Quite the contrary, the Court carefully reviewed plaintiff's work logs kept by defendants and found that, on the average, she worked approximately 50 hours a week. This finding is supported by the testimony of plaintiff and other witnesses that she and other National Graphics employees would often work overtime and on weekends. Depending on the time of the year, plaintiff sometimes would work more than this number of hours, and sometimes less. For purposes of calculating backpay, the Court sought to derive from the evidence a reasonable estimation of plaintiff's average work week during the several years plaintiff was employed at National Graphics. The determination of backpay need not be made with mathematical exactitude. *Grant*, 622 F.2d at 47. The finding that on average plaintiff worked approximately 50 hours per week is well supported by the evidence produced at trial.

## II. *Peters*

Two objections relating to the liability of defendant Peters have been raised. Both are little more than a rehashing of arguments presented before, during, and after trial. Defendants maintain that the Court's conclusion that Peters was an employer within the meaning of Title VII is

---

**4.** The Court notes that the therapist's testimony was not considered with regard to the issue of whether plaintiff suffered sexual harassment.

*See Memorandum of Decision,* at 922 n. 2 (May 19, 1989).

against the weight of the evidence because the evidence does not support the finding of supervisory status. Plaintiff testified that Anderson specifically informed her that Peters was to be her supervisor and that he did in fact perform certain supervisory functions. The Court finds plaintiff's testimony on this issue credible. Anderson cloaked Peters with actual and apparent authority. Peters played on this to his advantage, so that plaintiff reasonably believed, on the basis of Anderson's instructions, that Peters could carry out his threats and promises regarding the conditions of her employment. These facts are sufficient to find Peters a supervisor and an employer within the meaning of Title VII.

In addition, Peters once again raises the question of plaintiffs' failure to name him in the complaints filed with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC"). As the Court previously found, the evidence at trial was that Peters received actual notice of the administrative complaints and that he suffered no prejudice from the lack of formal notice. Under these circumstances, the Court properly refused to bar plaintiff from proceeding against Peters.[5]

## PREJUDGMENT INTEREST

The Court previously awarded plaintiff prejudgment interest on her backpay remedy. *See Memorandum of Decision*, at

926 (May 19, 1989). Plaintiff was directed to submit a proposed schedule of prejudgment interest using the interest rates provided in § 6621 of the Internal Revenue Code. *See Association Against Discrimination in Employment v. City of Bridgeport*, 572 F.Supp. 494, 495 (D.Conn.1983). Plaintiff has filed a proposed schedule, providing for $5,413.52 in prejudgment interest. Defendants have objected to plaintiff's proposed schedule, and have offered an alternative schedule of their own.

Plaintiff's calculations use an interest rate for substantial underpayment of taxes attributable to tax motivated transactions pursuant to § 6621(c). This rate is based on the so-called short-term federal rate plus three percentage points, multiplied by 120 percent. The proper rate, however, is simply the short-term federal rate set forth in § 6621(b). The adjustments to that rate provided in § 6621(c) for substantial underpayment of taxes go beyond the remediable scope of a Title VII backpay award. Defendants proposed schedule employs the appropriate interest rate. Therefore, the Court hereby adopts the proposed schedule of prejudgment interest set forth in Exhibit 3 to the Affidavit of Russell J. Dallai, Jr., which provides for prejudgment interest through the end of May, 1989 in the amount of $3,427.79.[6]

## ATTORNEYS' FEES

Plaintiff is a prevailing party within the meaning of 42 U.S.C. § 2000e–5(k), and is entitled to the recovery of reasonable attor-

---

**5.** In their motion for new trial on liability which they subsequently withdrew, defendants National Graphics, Napoli, and Anderson raised several issues relating to the adequacy of the evidence of sexual harassment. Contrary to defendants' suggestion, the Court found little or no inconsistency between plaintiff's testimony and that of her former co-workers that they did not see Peters sexually assault or otherwise harass plaintiff. The National Graphics plant was very noisy and views were often obscured so that the harassment could very easily have gone on without a co-worker having noticed it. To the limited extent that the co-workers' testimony may have conflicted with plaintiff's, the Court finds plaintiff's testimony the more credible, based on plaintiff's performance on the witness stand as contrasted to that of her former co-workers. In addition, the Court notes that the testimony of

some of the co-workers appears to have been affected either by some apprehension about Peters or a continued interest in employment with National Graphics. Moreover, as the Court has already found, plaintiff was eminently more credible as a witness than defendants. Defendants may wish that a different rendition of the facts were possible. On the basis of their testimony, however, the Court has no doubt about whom to believe and whom to disbelieve.

**6.** This amount was arrived at using compound interest. Defendant also offered a proposed schedule based on simple interest. Because the object of the award under Title VII is to make the plaintiff whole, the Court finds that the more appropriate calculation is that based on compound interest.

neys' fees and costs. An award of reasonable attorneys' fees is determined in a two-step process. First, a "lodestar" amount is calculated by multiplying the number of hours the prevailing party has reasonably expended in the matter by a reasonable hourly rate. Excluded from the lodestar calculation are any hours that have been found to be excessive, redundant, or otherwise not reasonably expended in the litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Moreover, the party seeking the fee award must provide adequate documentation of the hours claimed. *Id.* at 433, 103 S.Ct. at 1939. A reasonable hourly rate is that "normally charged for similar work by attorneys of like skill in the area." *Cohen v. West Haven Bd. of Police Commisioners*, 638 F.2d 496, 505 (2d Cir.1980). The second step after establishing the lodestar figure is any adjustment, upwards or downwards, of the award in light of such factors as exceptional success. *Blum v. Stenson*, 465 U.S. 886, 901, 104 S.Ct. 1541, 1550, 79 L.Ed.2d 891 (1984).

Defendants contend that certain hours claimed by plaintiff should be excluded from the lodestar calculation. In particular, defendants argue that plaintiff should not recover fees for time spent in relation to the issues of bifurcation of the federal and state claims and the calculation of prejudgment interest. Although a plaintiff in the appropriate circumstances might not be entitled to recover fees for time expended on unsuccessful claims entirely unrelated from those claims on which plaintiff prevailed, *see Hensley*, 461 U.S. at 435–36, 103 S.Ct. at 1940–41, the same logic does necessarily not apply to discrete legal issues that arise within the context of the litigation of the claim or claims upon which plaintiff has prevailed. The proper focus should be on the scope of plaintiff's overall success. *Id.* at 436, 103 S.Ct. at 1941; *see also* Garrison, *Attorney's Fees Under Fee-Shifting Statutes*, 58 Conn.B.J. 69, 70–71 (1984). If, as is the case here, plaintiff was successful on her claim and achieved the relief sought, she ordinarily should be entitled to recover fees for all the time reasonably expended in litigating that claim, regardless of whether she was successful on each and every particular legal issue that arose during the litigation. This is particularly true in this matter in light of plaintiff's complete success in establishing a violation of Title VII.

Defendants also maintain that plaintiff should not recover fees for time spent by Attorney Torre prior to when she joined the firm of Williams & Wise on the grounds that Torre had not begun formally representing plaintiff until that time. As plaintiff testified at trial, Attorney Torre did not represent her in the proceedings in March and April of 1986 before the CHRO or assist in the preparation of the CHRO complaint. Nevertheless, Attorney Torre did provide some counseling to plaintiff during this time period about proceeding before the CHRO. Thereafter, Attorney Torre agreed to formally represent plaintiff in what became the instant action. Despite the lack of a formal representation arrangement, plaintiff is entitled to recover fees for the time spent in March and April of 1986 in that the counseling offered at that time was integrally related to the instant litigation and was reasonably expended in furtherance of the claims upon which plaintiff ultimately prevailed.

In addition, defendants argue that those fees for the hours expended by counsel on issues related solely to the defendant Peters's defense should be borne by Peters. *See In re Air Crash Disaster at John F. Kennedy Int'l Airport*, 687 F.2d 626, 630 (2d Cir.1982). Defendants specifically identify 14.5 hours that they claim relate only to issues raised by Peters.[7] After careful review of plaintiff's time sheets and of the entire record, the Court finds that, of these 14.5 hours, 5.3 hours are properly chargeable only to Peters. Those hours related largely to the questions of Peters's default early on in the litigation and to Peters's motion to strike, neither of which had any

---

7. Defendants suggest that the specific times identified total 16.3 hours. It is apparent, however, that defendants have miscalculated. The total of the specific time expenditures they have identified is 14.5 hours.

connection with or otherwise aided the other defendants in their defense. The remaining hours, however, in part related to issues that, although raised by Peters, the other defendants came to rely on. In particular, plaintiff's counsel spent 9.2 hours in response to Peters's motion for summary judgment. One of the two issues raised therein was whether Peters was a supervisor under Title VII. The other defendants at trial adopted and relied upon Peters's position on that issue as set forth in his motion for summary judgment. However, the summary judgment motion also raised the issue of exhaustion of administrative remedies, on which the other defendants did not rely. A reasonable apportionment of plaintiff's time spent on these issues is 50 percent to each. Therefore, of the 9.2 hours spent responding to defendants' motion for summary judgment, 4.6 hours are chargeable to all defendants and 4.6 hours are chargeable only to defendant Peters.

■ Plaintiff requests that the fee award be calculated on the basis of hourly rates of $200 for Attorney Wise, $150 for Attorney Torre, and $50 for a student law clerk. Defendants object to these rates as unreasonably excessive. The Court is intimately familiar with the rates approved for fee awards in other civil rights actions and with the market rates for such litigation in general in this district. *See, e.g., Natale v. City of Hartford,* Civil No. H–86–928(AHN), slip op. at 8–10 (D.Conn. April 18, 1989); *Davis v. Little,* 118 F.R.D. 304, 306 (D.Conn.), *aff'd,* 851 F.2d 605 (2d Cir. 1988). Attorney Wise is a leading member of the civil rights bar of this district, and, as such, she is entitled to be compensated at an hourly rate greater than most attorneys. By contrast, Attorney Torre has less experience in the field. Although she acted as lead counsel in this matter, an hourly rate for Attorney Torre should reflect her lower level of experience. However, a reasonable rate for her time would not be as low as the $100 rate suggested by defendants. In light of plaintiff's overall success, the nature of the case, and the prevailing rates in similar litigation, the Court finds that hourly rates of $175 for Attor-

ney Wise, $120 for Attorney Torre, and $35 for the student law clerk are reasonable.

■ Plaintiff also seeks an enhancement of the lodestar figure. Even though the Court recognizes that the case presented for plaintiff some difficult issues of proof and that plaintiff was successful on those issues, these factors are taken into consideration in establishing the lodestar calculation and do not represent exceptional factors supporting an upward adjustment of the fee award.

In total, Attorney Wise spent 21.3 hours in connection with this matter, Attorney Torre spent 251.30 hours (9.9 of which are chargeable only to defendant Peters), and the student law clerk spent 5.7 hours. These hours were reasonably expended in furtherance of plaintiff's successful litigation. The Court therefore finds that all defendants are jointly and severally liable for $3,727.50 in fees incurred by Attorney Wise, $30,156.00 in fees incurred by Attorney Torre, and $199.50 for the services of the student law clerk. Plaintiff may recover an additional $1,188.00 in fees from defendant Peters.

Plaintiff also seeks costs. Defendants argue that plaintiff is barred from recovering costs because she did not submit a bill of costs within the ten-day period directed by Local Rule 17(a). The Court had originally ordered plaintiff to submit an application for fees *and* costs within ten days of its decision after trial. *See Memorandum of Decision,* at 926. It subsequently granted an extension of time in which to submit that application. Plaintiff's request for costs is thus not barred by Local Rule 17(a).

■ In the alternative, defendants attack certain costs claimed by plaintiff. Plaintiff has included in her request for costs a $500 fee of plaintiff's therapist for her services as an expert witness. In addition, plaintiff seeks $750 for the services of Slossberg & Sachs, an accounting firm, for services rendered in connection with the application for prejudgment interest. Although no member of this accounting firm actually testified at trial or a hearing, submissions prepared by the firm were filed on

plaintiff's behalf. Relying on *Crawford Fittings Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), defendants argue that plaintiff is limited under 28 U.S.C. § 1821(b) to a recovery of a $30 per day fee for any witness, expert or otherwise. The $30 limitation on witness fees provided by § 1821(b), as construed in *Crawford Fittings,* does not apply when the witness fees are awarded as reasonable expenses under a fee-shifting statute. *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1346–47 (1st Cir.1988); *Sapanajin v. Gunter,* 857 F.2d 463, 465 (8th Cir. 1988); *see also Crawford Fittings,* 482 U.S. at 445, 107 S.Ct. at 2499 (Blackmun, J., concurring); *but see Sevigny v. Dicksey,* 846 F.2d 953, 959 (4th Cir.1988). The Court finds that the expert witness fees were reasonably expended in furtherance of the litigation of plaintiff's claims. Plaintiff may therefore recover total expenses in the amount of $3,790.14.

## CONCLUSION

To the extent necessary, the Court's Findings of Fact and Conclusions of Law set forth in the *Memorandum of Decision* of May 19, 1989 are hereby AMENDED consistent herewith. Defendants' motions for new trial are DENIED. Plaintiff is awarded prejudgment interest in the amount of $3,427.79. Plaintiff is additionally awarded attorneys' fees in the amount of $34,083.00, for which all defendants are jointly and severally liable, and an additional $1,237.50 in fees from defendant Peters. Plaintiff is further entitled to $3,790.14 in expenses and costs. An amended judgment shall enter accordingly.

SO ORDERED.