Louis MIANO, Plaintiff,

v.

AC & R ADVERTISING, INC., Defendant.

Michael R. WIDENER, Plaintiff,

v.

AC & R ADVERTISING, INC., Defendant.

Morton WEINSTEIN, Plaintiff,

v.

AC & R ADVERTISING, INC., Defendant.

Nos. 91 Civ. 1280 (BN), 91 Civ. 1676 (BN) and 91 Civ. 3906(BN).

United States District Court, S.D. New York.

Jan. 23, 1995.

during the pendency of this litigation, as well as front pay. The remaining issues in the case, namely liability and the *quantum·* of damages, will be decided in a jury trial at a future date.[2]

The reinstatement hearing was tried in two phases. The first phase commenced on September 12, 1994 and ran through September 23, 1994, at which time the court adjourned until October 11, 1994. The second phase began on October 11 and concluded on October 19, 1994. The record of the hearing, totalling fifteen days, was broken down into a September record and an October record. References to the first part of the record will hereafter be preceded by the letter "S", followed by a page reference. Page references to the October record will be introduced by the letter "O". The final post-trial submissions were received on December 22, 1994.

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and the provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). Jurisdiction over plaintiffs' claims under the New York Executive Law, § 296 *et seq.* arises pursuant to the court's supplemental jurisdiction, 28 U.S.C. § 1367. The following constitute the court's findings of fact and conclusions of law in accordance with Fed. R.Civ.P. 52(a).

Richard W. Meirowitz, New York City, for plaintiffs.

Anderson Kill Olick & Oshinsky, P.C., Washington, DC (Gerald S. Hartman, Dona S. Kahn, Gregory W. Homer, John E. Menditto and Chaim Book, of counsel), for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

**BERNARD NEWMAN, Senior Judge:**[1]

In this consolidated action, three former advertising executives allege that they were unlawfully terminated by reason of their age. The case was assigned to the writer, sitting without a jury, for the purpose of determining whether, under *Ford Motor Company v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), plaintiffs should be precluded from recovering back pay accruing after the date when they rejected offers of reinstatement made to them by defendant

## FINDINGS OF FACT

Plaintiffs are individuals residing in New York City. Defendant AC & R Advertising, Inc. is a corporation organized and existing under the laws of the State of New York, and maintains an office in the City, County and State of New York. AC & R was acquired by the Ted Bates advertising agency in 1966 and is now known as Bates Manhattan, a division of Bates. The Bates agency is in turn owned by Saatchi & Saatchi. Defendant will be hereafter referred to as AC & R for convenience.

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

2. Ordinarily, the court's consideration of equitable remedies would follow the jury's determination of liability. Because the potential award in this case was viewed as an obstacle to the possibility of settlement, the court (Stanton, *J.*) ordered that trial of the issue of reinstatement precede the trial of liability and damages.

AC & R is an advertising agency, and as such is engaged in an industry affecting commerce and employs twenty or more employees. AC & R is an employer within the meaning of the ADEA. 29 U.S.C. § 630(b).

Plaintiff Louis Miano ("Miano") commenced employment with AC & R on May 27, 1966 as a junior copywriter. Miano was promoted to Copy Chief shortly thereafter and was named Creative Director in September 1970. Miano was a member of the Executive Committee of AC & R since its inception. As Creative Director, Miano was responsible for the oversight and creation of ad campaigns, including slogans, scripts and headlines. As a necessary part of his duties at AC & R, Miano had direct client contact at briefings, meetings and presentations for and on behalf of AC & R. Miano represented AC & R at meetings, including new business meetings, in the United States and around the world. At the time of his termination, Miano held the title of Vice Chairman, Director of Creative Services. On May 1, 1990 Miano was dismissed by Stephen Rose ("Rose"), Chairman of the Executive Committee and the Chief Executive Officer ("CEO") of AC & R. At the time of his termination from employment, Miano's annual salary was $215,000. In 1989, Miano received a bonus of $25,000. Miano was fifty-five years of age at the time that Rose discharged him.

Miano filed a charge of age discrimination with the Equal Employment Opportunity Commission on or about December 17, 1990. Subsequently, on February 21, 1991, Miano instituted an action in this court, and at his request, the EEOC advised that it had terminated its investigation of Miano's charge of age discrimination based upon the commencement of the instant action. The EEOC had not commenced any civil action at such time.

Plaintiff Michael Widener ("Widener") began his employment with AC & R on January 5, 1981 as Vice President, Media Director. On August 16, 1984 Widener was promoted to Senior Vice President. At the direction of Rose, Widener was dismissed from his position by plaintiff Morton Weinstein ("Weinstein") who at that time was the Executive Vice President and Director of Marketing Services and the person to whom Widener directly reported. At the time of his termination from employment, Widener's annual base salary was $76,000. When he was discharged, Widener was fifty-five years of age.

As Media Director, Widener was for ten years the person with direct and principal oversight responsibility for media planning and buying, the designing of media strategies and new business. In addition to Widener's administrative duties as Media Director, his responsibilities frequently required him to make presentations in meetings where AC & R's clients were present.

Widener filed a charge of age discrimination with the EEOC on or about January 7, 1991. On March 11, 1991, Widener commenced an action in this court against AC & R, and the EEOC by letter dated April 30, 1991 advised that it had terminated its investigation based upon the commencement of this action. No civil action had been commenced by the EEOC at that time.

Weinstein began his employment with AC & R on September 3, 1973 as Vice President, Media Director. Weinstein was promoted to Senior Vice President on or about August 16, 1977, and to Executive Vice President, Director of Marketing Services on or about October 11, 1983. Weinstein had supervisory responsibility over the Media, Research and Marketing Departments, became a member of the Executive Committee shortly after it was created, and later became Secretary. At times during his employment with AC & R, Weinstein represented the defendant at meetings in the United States and abroad, often making presentations to AC & R's clients.

On October 3, 1990, Rose terminated Weinstein. At that time, the position held by Weinstein was abolished and its responsibilities were divided among the account executives. Weinstein was the Executive Vice President and Director of Marketing Services of AC & R, and was fifty-three years of age when he was fired. As of the time of his termination, Weinstein's annual base salary

was $130,000. In 1989, Weinstein received a bonus of $25,000.

Weinstein filed his charge of age discrimination with the EEOC on or about March 6, 1991. Thereafter, Weinstein commenced an action against AC & R on June 11, 1991, and by letter dated June 17, 1991, the EEOC advised that it had terminated its investigation in the matter of Weinstein's dismissal based upon the filing of this action.[3] Prior thereto, no civil action had been commenced by the EEOC.

The positions that plaintiffs held at the time that Rose dismissed them shared several important common characteristics. All three plaintiffs had direct client contact, made presentations in client meetings, and required as a necessary part of their positions the confidence of AC & R's clients. Similarly, their ability to function at AC & R required the trust and confidence of their colleagues in senior management, with whom they worked closely, as well as the respect of the people who reported to them directly.

Prior to terminating plaintiffs, Rose approached Alvin Chereskin ("Chereskin"), then the Vice Chairman of AC & R, Harry Koenig ("Koenig"), the Chief Financial Officer, and other members of the Executive Committee. Chereskin consented to the proposed action, as did the other members of the Executive Committee. Plaintiffs did not have personal knowledge that Chereskin had acquiesced in their termination, however, and believed that Chereskin did not participate in the decision. S:918; 1014. Koenig claimed at trial that he had endeavored to dissuade Rose from terminating Weinstein, albeit solely out of concern for the company's long-term interests. S:266; 734–35.

AC & R's clients were advised concerning the termination of plaintiffs. O:338. The termination of plaintiffs and the subsequent litigation caused the agency's clients to be concerned about the stability of the agency. O:400–05; 500.

Following Miano's dismissal, Rose promoted two men who had previously reported to Miano, Robert Goolrick and Richard Cohn, to the position of Co–Directors of Creative Services. Goolrick and Cohn were informed by Karen Amorelli, then the President of AC & R's New York office, that they would have to compete with each other for the position of Director of Creative Services. By mid-April, Cohn was terminated and Goolrick remained as the sole Director of Creative Services. O:537. Goolrick had previously experienced a strained working relationship with Miano, displaying some degree of hostility as well as impatience with some of Miano's orders. O:48–49.

Rose replaced Widener with Randy Novick ("Novick"), whom he regarded as being more adept at making presentations to clients than Widener. However, the management at AC & R came to believe that Novick did not possess Widener's administrative ability, and Harry Koenig, now the Chief Operating Officer, determined that the Media Department had fallen into disarray.

In May 1990, shortly after his termination by Rose, Miano had a meeting with Koenig, then the Chief Financial Officer to address personnel matters in connection with his departure. At that meeting, Koenig encouraged Miano to file an age discrimination suit and assured him, somewhat cryptically, that proof existed to support his claim. S:1210. Koenig did not immediately elaborate on this revelation. However, Koenig met Miano over lunch on several subsequent occasions throughout the year, during which meetings Koenig related names of certain individuals who were present at a meeting in Irvine, California, where Rose discussed recent personnel changes in New York and allegedly made statements about his termination of plaintiffs and the subsequent promotion of Goolrick, Cohn and Novick. The content of those statements, if ultimately found to have been made by Rose, would be evidence that plaintiffs were terminated by reason of their age.[4] Koenig discussed with Miano who, if

---

**3.** All three plaintiffs similarly filed charges with the New York State Division of Human Rights, and subsequently requested and obtained the dismissal of those charges due to the filing of the instant action.

**4.** *See Miano v. AC & R Advertising, Inc.,* 148 F.R.D. 68, 73, 88 (S.D.N.Y.) (Katz, *J.*), *adopted and approved,* 834 F.Supp. 632 (S.D.N.Y.1993) (Sand, *J.*).

anyone, should be sued in addition to AC & R. S:1215. Koenig even mentioned that his own daughter was a labor lawyer and suggested that Miano retain her for the case at bar! *Id.*

The court need not find nor, indeed, can it determine what motivated Koenig to expend so much effort secretly launching the *Miano* action at a time when Koenig was still a highly placed officer of defendant. Koenig's sudden alliance with Miano is all the more puzzling when one considers that the two men were not friends. S:1209. Moreover, during the 1980's, Koenig had behaved abusively to members of Miano's staff, including Miano's assistant, Elaine Vetter. Miano ultimately confronted Koenig angrily on one occasion and even asked Rose to discipline Koenig for his behavior. S:1202; O:53. In any event, whatever the motive may have been for Koenig's assistance to Miano, Koenig later came to regret his indiscretion.

Weinstein's dealings with Koenig were similarly marked by mutual antagonism. S:1041. During Weinstein's tenure at AC & R, he dealt with Koenig purely in administrative matters involving personnel, finances and business operations, but did not report to Koenig. O:1017. Weinstein experienced numerous conflicts with Koenig over a fifteen year period, and on occasion expressed his grievances directly to Rose. O:1035. As a result, Weinstein learned that Koenig had referred to him within the company as a "backstabber," among other personal insults. Weinstein returned the insult, calling Koenig a *"vantz"*, meaning a bug, or a nobody. S:336–37.

Koenig's malevolent behaviour toward Weinstein continued unabated after Weinstein was discharged. For several weeks after Rose fired him, Weinstein was permitted to maintain an office in AC & R's annex, apparently to assist him in securing new employment. During that period, however, Koenig cut off Weinstein's use of photocopy, computer and telephone facilities. Weinstein protested, but Koenig laughed at Weinstein and responded by waiving his daughter's business card with the suggestion that Weinstein take the matter up with her. S:1073.

Moreover, and during the same period, Weinstein experienced a similar chill in his other relationships at AC & R. Weinstein testified that he was "ostracized" by members of the Executive Committee while he was at the annex. Additionally, although Chereskin initially undertook to assist Weinstein in securing a position at Spielvogel Bates, Chereskin then broke off contact with Weinstein. O:1036.

In mid-December, Rose announced his retirement from AC & R, shortly after his failure to persuade Saatchi & Saatchi to accept a management buyback bid led by him and other members of the Executive Committee.

The date when Rose stepped down as CEO and when his successor, Chereskin, assumed the title and function of CEO became the subject of considerable controversy during the trial. Plaintiffs insisted that Chereskin became the CEO in title and in reality by Christmas of 1990. Accordingly, plaintiffs argue, there was reason to doubt the *bona fides* of defendant's offer of reinstatement. Defendant sought to prove that Rose continued to hold the title of CEO until the expiration of his employment contract on March 31, 1991, and that due to a long-standing "cold war" between the two men, Chereskin refused to exercise the function of CEO until Rose left the premises of AC & R.[5]

Koenig claimed at trial that his offers of reinstatement were sincere, inasmuch as there was an urgent need to fill the positions of Director of Creative Services and Media Director. S:288. Moreover, several witnesses for defendant, including Koenig, testified that they thought the reinstatement of-

5. Rose stated that, due to his acquisition of shares in connection with his position at the Bates agency, a rift emerged between him and Chereskin, and the two men never spoke to each other directly after 1986. Chereskin continued to hold his position as Vice Chairman, but restricted himself to managing the Estee Lauder account, while Rose remained as CEO and su-

pervised all other accounts. The company fissured into the "Rose camp" and the "Chereskin camp", with Koenig serving as an intermediary and bearer of messages between the two men. O:99–103. Moreover, Miano and Weinstein were perceived to be in the "Rose camp", (O:330–35) thereby causing them to wonder about where they might stand with Chereskin as CEO.

fers were a good idea, and that the reinstatement of plaintiffs was workable from their point of view. The court is skeptical of those claims in any case, but considering that defendant failed to make offers of reinstatement until many months after the termination of Miano, Widener and Weinstein—and eight months after Rose announced his resignation—the testimony of all those witnesses on that point is yet more dubious if Chereskin and Koenig had full control as early as January, not April 1991 as several of defendant's witnesses stated.

For the reasons that follow, the court resolves this dispute in favor of plaintiffs.

Rose admitted at trial that he had little or nothing to do with AC & R after December 1990. O:93. He informed Saatchi & Saatchi of his resignation on December 10, 1990, which was confirmed about a week later. O:106. What happened subsequently was less clear. It appears that Rose remained physically on the premises of AC & R for some of the time until March 31, 1991, during which period he was available to answer occasional questions and give some degree of advice to Koenig, who had been elevated to the position of Chief Operating Officer and assumed many of the responsibilities ordinarily exercised by the CEO. S:355, 361. Rose was otherwise uninvolved with the management of AC & R as of early January 1991.

Chereskin stated that he did not decide to accept the position of CEO until January, and did not actually acquire the job until April 1991. S:93. Koenig corroborated this testimony, stating that Chereskin refused to assume the role of CEO "until Mr. Rose stepped out of the building and did not show up again," presumably because, as far as Chereskin was concerned, Rose was still CEO until his contract expired on March 31, 1991. S:355–56. However, the balance of the credible evidence contradicts the testimony of defendant's witnesses on this point.

The former President of AC & R, Patrick King ("King") testified at the trial concerning a series of conversations that he held with Rose and other executives in mid December on the subject of Rose's retirement. His account of those conversations was detailed and extremely credible. King first testified that on or about December 14, 1990 he flew at Rose's behest to New York from AC & R's West Coast offices, where he was then based. O:224. He then had a dinner meeting with Rose, Koenig and another executive of AC & R, Karen Amorelli ("Amorelli") at which time Rose informed King that he would be stepping down as CEO immediately and that he would be succeeded by Chereskin. Following the dinner meeting, Koenig and Amorelli confirmed to King that Chereskin was in charge of AC & R and would be officially so as of January 1, 1991. O:222.

The following day, King met Rose at the New York office, where Rose repeated that he was no longer running the company and that Chereskin would be taking over immediately, although an official announcement would not be released to the advertising media until January. O:225.

It appears that King did not return to the West Coast until January, at which time he conferred by telephone with Rose, who was then preparing the press release. At Rose's request, King advised the management at the Los Angeles and Irvine, California offices concerning the imminent public announcement of Rose's departure. Subsequently in early January, King spoke with Chereskin, who acknowledged that he was CEO. O:227.

On January 10, 1991, the following press release was disseminated:

### PRESS RELEASE

(for release on January 10, 1991)

Stephen Rose will retire as Chief Executive Officer of AC & R Advertising, it was announced today by Robert Louis–Dreyfus, Chief Executive Officer of Saatchi & Saatchi Company in London. * * * *

He will be replaced immediately as Chief Executive Officer of AC & R by Alvin Chereskin, presently its Vice Chairman.

Plaintiff's Exhibit 40.

Additional evidence demonstrates that Chereskin began to assert his leadership of

AC & R at a meeting of the Executive Committee on January 1991.[6]

King did not speak again with Chereskin until early March of 1991, at which time Chereskin and Koenig came to see King in Los Angeles. O:229. They met at a restaurant in Malibu, where they discussed the recently filed lawsuits against AC & R, and Chereskin conveyed certain instructions to King at that time. O:266–67.

To be sure, there is some evidence that neither Rose nor the new CEO, Chereskin, were performing the duties of CEO during the first three months of 1991. However, the reason for this fact was not the purported desire of Chereskin to avoid friction with Rose; rather, Chereskin simply had little desire to immerse himself in the business of running the agency at all. Chereskin, unlike Rose, was not attracted by administration and preferred to concern himself primarily with the creative endeavors associated with hands-on management of client accounts, and the Estee Lauder account in particular. Estee Lauder was AC & R's largest single account and generated far more in billings than the second largest account.

With Chereskin concentrating on Estee Lauder, the business of running AC & R fell to Koenig as of January 1991, who was promoted from Chief Financial Officer to Chief Operating Officer ("COO"). It would appear, that although Chereskin was holding himself out to the agency's management and clients as the CEO, and established policy generally, Koenig had in actuality become a sort of "shadow CEO" for Chereskin. Thus, given Koenig's expanded role at AC & R, plaintiffs would have been subject to Koenig to a greater extent than they had been when he was the Chief Financial Officer. Although Koenig was performing Chereskin's function as CEO, it remains a fact that Chereskin and Koenig could have arranged to reinstate plaintiffs as early as January, should they have been so inclined; Rose would not have been an impediment. Indeed, Chereskin even discussed the matter with Amorelli at that time but took no action. Moreover, the possibility of reinstatement had been intimated to King, who then alerted Miano. Miano told King that if Chereskin were in fact contemplating reinstatement he should write him with the details; no such correspondence took place, however, until August 1991. S:974.

However, charges had already been filed with the EEOC, and Miano had been engaged in a particularly aggressive variety of pretrial discovery. Specifically, at Koenig's instigation, Miano telephoned several members of AC & R's senior management for the purpose of extracting information to help him in his lawsuit. He tape recorded those conversations without the consent of Chereskin, Koenig and the other people involved.

During one of these conversations, Koenig tried to persuade Miano to refrain from legal action against AC & R. S:376. Koenig was desperate to make the lawsuit "go away"; he plainly had not anticipated in May 1990 that in six months he would become the COO (and really, the surrogate *CEO*) of a company which he had willfully exposed to a lawsuit involving the scrutiny of the advertising industry, AC & R's parent company, and the agency's clients, not to mention a potential liability in the millions of dollars. Miano indicated that he intended to prosecute his lawsuit.

Once the lawsuit was filed, Koenig reacted angrily, and more so when he realized that Miano had taped his conversations, not only with Koenig's suggested list of informants but with Koenig himself. Early in 1991, Koenig initiated a campaign of isolation, directing that AC & R employees were no longer to have any communication with plain-

---

6. Chereskin opened the committee meeting, and the following constitutes the first entry in the minutes:

Agency Philosophy

Alvin opened the meeting with a discussion of the agency's philosophy. "We want to make good ads and good profit." We will go after clients which have potential for both and which fit in with other clients. Clients should be proud to hear of the company they keep. We should identify the right creative talent within the agency and make AC & R attractive to creative talent who would not currently choose to join us.

Significantly, Chereskin also had the last word, which was recorded at the close of the minutes:

"Alvin said to get our house in order first." Plaintiff's Exhibit 47.

tiffs, and intimating to at least two employees, Elaine Vetter and Marge Langone, that their jobs would be in jeopardy if they did continue to speak to plaintiffs. O:184–86; O:823–25. Further, Koenig began referring to the three plaintiffs and another former employee, Ann Forgione,[7] in the presence of AC & R employees as "The Gruesome Foursome," (O:400–01) a fact that became known to plaintiffs by the time the reinstatement offers were ultimately made. O:4; O:953.[8] Thus, even if AC & R management were to instruct its employees to work with plaintiffs, Koenig had already put the staff on notice that plaintiffs were persona non grata.

Although reinstatement remained an option even after the filing of the instant actions, it certainly was not considered for the reasons Koenig and Chereskin offered at trial. Although Chereskin was unsatisfied with Goolrick, and Novick was new to administration, the court does not accept that the proposed reinstatement of plaintiffs was intended to fill gaps in creative and media leadership. Tellingly, King testified that Koenig told him during a telephone conversation in the spring or early summer of 1991 that if plaintiffs returned to work, they would be given an office, a salary, and no responsibilities. O:250–51. Although Koenig was recalled by AC & R as a rebuttal witness and denied having related such plans to King, the court considered King a completely truthful witness and discredits Koenig's denial. Accordingly, the court finds that AC & R had no intention whatsoever of genuinely reinstating plaintiffs to their former positions or to anything that could remotely be described as substantially equivalent positions. It should be noted, however, that the court finds no evidence that defendant's counsel, who wrote the reinstatement letters, was

himself aware that Koenig contemplated such an unmitigated sham.

Nor was Koenig the only person at AC & R who would have prevented plaintiffs from exercising their previous function. For example, Martin Mitchell, Jr., the Director of Account Services, testified that he would have worked around Miano when generating the creative product for his accounts. Although he later equivocated, it remains a fact that Mitchell would not have submitted to Miano's leadership. O:737–38.

As concerns Widener, it was revealed that Widener would not have been permitted to make client presentations if he returned to work; that function would continue to be exercised by Novick. Widener would be limited to his prior administrative functions (if, indeed, he were permitted to perform *any* duties). S:578–81; O:503.

On June 17, 1991 Chereskin and Koenig presented a plan to Saatchi & Saatchi whereby they and several other members of AC & R management would buy back AC & R, forming a company called "Newco". Plaintiffs' Exhibit 34. Part of the representations made to Saatchi & Saatchi were that the new agency would retain substantially all its prior employees. Saatchi & Saatchi turned the offer down within one week.

On August 2, 1991 defendant made settlement offers to plaintiffs which provided, among other things, a cash settlement offer[9] and a condition that plaintiffs not seek further employment with AC & R. On August 6, 1991 Miano and Widener refused the settlement offers as inadequate.

On the following day, August 7, 1991, at the direction of Koenig and Chereskin, defendant's counsel communicated by letter with plaintiffs' counsel, offering each of the three plaintiffs reinstatement to their former positions at AC & R.[10] Defendant's Exhibits A1,

7. Forgione settled a related action against AC & R on November 5, 1992.

8. Miano alleged that Koenig went to the length of destroying his mail. It appears that Koenig merely intercepted any mail that would contain business proprietary information, and destroyed bulk-rate junk mail. S:278–9; 718–21. Furthermore, although two requests from Miano for references to potential employers went unanswered, it was AC & R policy not to respond

other than to give the employee's dates of employment and the last job title held. S:740.

9. The precise amount in dollars was redacted from the letters before the settlement offers were admitted into evidence.

10. None of AC & R's senior management, other than Chereskin and Koenig, were aware of or consulted about the reinstatement offers, includ-

A2 and A3 (Letters of Gerald S. Hartman, Esq., hereafter "the reinstatement letters"). Defendant offered to reinstate plaintiffs to the same positions that they held prior to termination, mentioning specifically their job titles and salary, and further reciting that their duties would be the same as before. Eligibility to receive yearly bonuses and fringe benefits would be "on the same basis as other executives at the agency on his level". As to each plaintiff, AC & R represented through its counsel that the offers were completely unconditional. In each letter, defendant's counsel recited, "[i]n particular, the offer is in no way contingent or dependent upon Mr. [Name] dismissing or compromising his current lawsuit against AC & R." *Id.*

The letters also went on to state, again in each case:

As Mr. [Name] is no doubt aware, AC & R's profitability has been a source of concern for some time now and various measures have been implemented or suggested to remedy the situation. At the present time, efforts are underway to sell the assets of AC & R to a management group or other third party. In the event such a sale were to take place, AC & R would cease doing business and that entity would no longer employ any individuals. It would be totally outside of AC & R's control as to which, if any, AC & R employees would be hired by the purchaser.

The letters concluded by requiring an answer by August 13, 1991, and stated that a failure to respond by that time would be deemed a rejection of the offer. The deadline for plaintiffs initially to respond was extended by agreement to August 23, 1991. At the time the offers were made, plaintiffs were not otherwise employed.[11]

Plaintiffs were informed by counsel of the substance of the offers. Although plaintiffs were cautiously receptive to the offers, they communicated several concerns to AC & R before deciding whether to accept or reject the offers. By letter dated August 23, 1991, plaintiffs' counsel related several concerns regarding the hostility that had been expressed to them in the course of the pending litigation and the hostility and suspicion that they should reasonably anticipate from the staff at AC & R in the event that they did return. Plaintiffs further sought reassurances concerning AC & R's reservation within the reinstatement letters, i.e., in which AC & R disavowed responsibility for plaintiffs' future at AC & R in the event that it was sold:

[I]t is unclear whether AC & R's offer is intended to put my clients in the same position as would have been the case had they not been terminated. For example, if there is to be management buy out, my clients would have been expected to participate in that transaction. Alternatively, if a third party were to purchase the assets of AC & R, my clients would have expected to be provided with continuing employment guarantees as key member of AC & R's staff. Finally, the prospective sale of AC & R's assets has raised the issue of whether its reinstatement offer is a sham designed with the intention of terminating them again, this time in the context of a reorganization, in an attempt to cap damages.

Defendant's Exhibit A6. AC & R responded through its counsel that no "aura of hostility" toward plaintiffs actually existed. Defendant further stated, among other things, "AC & R management and its employees agree not to act in a hostile manner towards your clients should they accept reinstatement," and that no retaliation would take place. It further stated that plaintiffs would have the "same status, job responsibilities, and working conditions" as before. Finally, defendant repeated that it had no contractual obligation to hold plaintiffs harmless in the event that AC & R were later sold to a third party. AC & R set August 29, 1991 as the new deadline for plaintiffs to respond. Defendant's Exhib-

---

ing defendant's personnel director, Robin Michaels.

**11.** The assignment of this action did not encompass the issue of whether plaintiffs took adequate steps to mitigate their damages. Counsel agreed at trial, moreover, that this issue was to be determined during the jury trial of the remaining issues. O:26–27.

it A7 (Letter of Gerald S. Hartman, Esq., dated August 26, 1991).

The next day, August 27, 1991, while the reinstatement offers were still under consideration by plaintiffs, a series of affidavits were delivered to plaintiffs' counsel, ostensibly in response to discovery requests in the *Weinstein* action. The affiants were: Amorelli (then President of AC & R's New York operation); Martin Mitchell, Jr. (then the Vice Chairman and Director of Account Services of AC & R); Goolrick (Miano's ultimate successor as Director of Creative Services); Steven Bennett (Senior Vice President and Management Supervisor); Sheldon Marks (then the Vice Chairman of the Executive Committee and Director of Account Services of AC & R); and Rose, who at this point in the litigation had resigned as CEO. The affidavits generally disparaged plaintiffs personally, criticized their professional ability and recited, verbatim in virtually every case, that the affiant believed the decision to terminate each of the plaintiffs was "justified, legitimate and in the best interests of AC & R, its future and its clients." *See* Plaintiff's Exhibits 6, 7. A number of the affidavits also expressed the opinion that one or another of the plaintiffs should have been fired much earlier. Some illuminating excerpts from the affidavits follow:

*Karen Amorelli:*

On Lou Miano: "I believe that AC & R's decision to fire Mr. Miano because of his poor job performance was justified, legitimate and in the best interests of AC & R and its clients ... In my professional opinion, Mr. Miano should have been fired by AC & R much earlier.... I am firmly convinced that Mr. Rose's comments to me that Mr. Miano was "over the hill" and "tired" were directed entirely to his inability to perform properly his duties as Director of Creative Services ... As Messrs. Cohn and Goolrick assumed responsibility, it became impossible to justify Lou's salary .."

On Micheal Widener: "I believe that AC & R's decision to fire Mr. Widener because of AC & R's business concerns and Mr. Widener's performance was justified, legitimate and in the best interests of AC & R,

its future and its clients ... He lacked the skill to effectively present media strategy, philosophy and plans developed by AC & R ... Had not Mort Weinstein intervened on Mr. Widener's behalf with Mr. Rose on several occasions, I believe that Mr. Rose would have fired Michael Widener several years before his employment at AC & R was terminated ... Mr. Rose told me that Mr. Widener did not have what it takes to be in the advertising business and described him as a "second rate" talent several times during the years Mr. Widener was employed by AC & R .. In my professional opinion, Mr. Rose was very good at assessing both AC & R's staff and business needs."

On Mort Weinstein: "I believe that AC & R's decision to fire Mr. Weinstein because of his deteriorating job performance and his mistreatment of AC & R's professional and support staff was justified, legitimate and in the best interests of AC & R, its future and its clients ... AC & R's problems with Mr. Weinstein started well before he was dismissed. On numerous occasions, Mr. Rose told me that Mort Weinstein had "lost it" and had deteriorated from being a "first-rate, creative marketing person" to being a cranky, hostile individual who seemed disinterested in his work ...".

*Steven Bennett:*

On Lou Miano: "I believe that AC & R's decision to fire Mr. Miano was justified, legitimate and in the best interest of AC & R, its future and its clients ... In my professional opinion, Mr. Miano coasted for approximately three years, used the office as basically a place of convenience and should have been fired by AC & R much earlier ... Lou Miano failed to provide the creative product required by many of AC & R's clients in whose businesses he seemed significantly less, if at all, interested."

On Micheal Widener: "I believe that AC & R's decision to fire Mr. Widener was justified, legitimate and in the best interest of AC & R, its clients and its future. I was keenly aware that more often than not Mr. Widener's subordinate, Mr. Randy No-

vick, gave media presentations to clients and potential new business. To me, and I believe to others at AC & R, there was concern over the adverse perception created for AC & R's clients and potential new business when, unlike our competitors, we were unable to use our Media Director to make presentations concerning media".

*Sheldon Marks:*

On Lou Miano: "I believe that AC & R's decision to fire Mr. Miano was justified, legitimate [and] in the best interest of AC & R, its future and its clients.... In my opinion, AC & R desperately needed a different creative attitude, fresh thinking and a leadership approach to creative work that was responsive to all our clients. While Lou Miano was a brilliant writer for some accounts, he abdicated responsibility from many accounts and his increasing preoccupation with his personal affairs also left him with less time and diminished his ability to concentrate on AC & R's accounts and writing creative material."

On Michael Widener: "I believe that AC & R's decision to fire Mr. Widener was justified, legitimate and in the best interest of AC & R, its future and its clients.... Although Mr. Widener was a good administrator, his weak presentation skills and lack of creative instinct for media adversely affected AC & R in its business."

On Mort Weinstein: "I believe that AC & R's decision to fire Mr. Weinstein was justified and legitimate.... AC & R's problems with Mr. Weinstein started well in advance of the time he was dismissed. On numerous occasions, Mr. Rose told me that Mort had abdicated certain of his supervisory responsibilities and that specifically the Media and Research divisions were operating and running without Mort and no longer reported to him ... Mort Weinstein was not a team player, rarely volunteered his creative ideas regarding work unless you specifically asked him, was difficult, often treated AC & R's staff poorly and looked down on many of them."

*Martin Mitchell:*

On Lou Miano: "I believe that AC & R's decision to fire Mr. Miano was justified, legitimate and in the best interest of AC &

R, its clients and its future ... In my professional opinion, Lou Miano had not kept up with the times, his level of creativity was not sufficient for the retail, automotive and packaged goods accounts that AC & R was attracting. Furthermore, he did not command the respect in the creative industry in order to recruit the type of talent necessary for those accounts.... In my opinion, AC & R desperately needed a different creative attitude, fresh thinking and a leadership approach to creative work that was responsive to all our clients."

On Michael Widener: "I believe that AC & R's decision to fire Mr. Widener was justified, legitimate and in the best interests of AC & R, its future and its clients. In my opinion, AC & R made the right decision by firing Mr. Widener as its Media Director ... Mr. Widener lacked the presence, charisma and excitement required of a media director and could not provide the creative approach to media which was needed by AC & R for its clients ... Therefore, I tried not to have Mr. Widener work on my accounts and did not have him present media ideas or plans to the account representatives of account [sic] for which I had responsibility including Sterling Motor Cars account. I also did not use him for new business presentations."

On Mort Weinstein: "Based on my personal observations and conversations with Stephen Rose and others at AC & R, I believe that Mr. Weinstein was fired as AC & R's Executive Vice–President, Director of Marketing Services because he did not fully run his department and abdicated his responsibilities for AC & R's media and research division."

*Robert Goolrick:*

On Lou Miano: "I also believe that AC & R's decision to fire Mr. Miano was entirely justified, legitimate and in the best interests of AC & R and its clients. During the third week of April 1990, Mr. Rose told me that he intended to fire Lou Miano. During that conversation, Mr. Rose said that Lou was "tired" and "not interested in the business any more." Mr.

Rose also indicated that Lou lacked energy, enthusiasm toward work and his talents had deteriorated to the point where "there were fresher horses in the stable." ... Mr. Rose's comments to me paralleled my overall assessment of Lou Miano's job performance as AC & R Director of Creative Services during the previous few years.... He was widely criticized by both his colleagues and AC & R senior executives for his poor work performance and "Lou doesn't have a clue" became a popular comment concerning his work performance around the office."

On Michael Widener: "In my position as Co–Director of Creative Services and subsequently as Director of Creative Services, I had very little contact with Mr. Widener. However, I never found Mr. Widener's oral presentations to AC & R's clients and potential new business to be particularly persuasive or to effectively present AC & R's media concepts and ideas."

*Stephen Rose:*

On Lou Miano: "Although I ultimately fired Mr. Miano, AC & R's senior executives collectively believed and decided that Lou Miano should be dismissed.... I believe that the decision to fire Mr. Miano was justified, legitimate and in the best interest of AC & R, its future and its clients ... I told [AC & R's senior executives] that Lou Miano had lost his touch, no longer provided any fresh creative leadership and was, professionally speaking, over the hill."

On Michael Widener: "In my professional opinion, Mr. Widener was only a fair to poor Media Director throughout his career with AC & R and lacked the requisite skills to effectively present AC & R's media strategies, philosophies and plans to either AC & R's existing clients or potential new business ... Therefore, I believe that the decision to fire Mr. Widener was justified, legitimate and in the best interest of AC & R, its future and its clients."

On Mort Weinstein: "I believe that the decision to fire Mr. Weinstein was justified, legitimate and in the best interest of AC & R, its future and its clients ... I fired Mort Weinstein because I felt that he had become ineffective, had lost his talent and enthusiasm for AC & R and the advertising business and was not performing any real function at AC & R ..."

As of the time that the reinstatement offers were made, and at the time that they were rejected, the affiants were all persons with whom plaintiffs would be required to work closely in the event that plaintiffs were reinstated to their former positions at AC & R, with the qualified exception of Rose.[12] Even Rose, however, would present problems for plaintiffs if they had returned to AC & R: although he would not work with any of the plaintiffs on a daily basis, at the time the offers were open it was more likely than not that Weinstein, if not also Miano, would make client presentations to Rose in meetings involving at least one of AC & R's clients, London Fog.[13] O:650. Weinstein worried about the impact of Rose's continued role upon his functioning at AC & R: "If I were to go back, I feared almost that I would have to present to him and he could be scathing." O:1037.

The conduct of the litigation had already led to tension between plaintiffs and certain employees, in part on the issue of Miano's clandestine taping of telephone conversations. Although the recording of telephone conversations is not prohibited by New York law, several AC & R employees considered Miano's actions to be underhanded, and in some cases, illegal. (Chereskin, S:63, 224; Bennett, O:521–23; Marks, O:664–66; Mitchell, O:790–91; Novick, S:895–90). Moreover, plaintiffs were aware of this at the time they

12. Several witnesses testifying for defendant, including the affiants, had received generous severance packages. Some had left voluntarily and were not entitled to severance under company policy, but received "special separation agreements." Those agreements stipulated, among other things, that the former employees would assist AC & R in any future litigation.

13. Rose served on the board of directors of London Fog and was engaged by them as an advertising consultant. He also performed a similar role for another AC & R client, Seiko Tokyo. Additionally, he received compensation as a consultant to AC & R itself, although he was never asked to perform that function following his retirement.

rejected the reinstatement offers. Employees who attended the Irvine meeting, where Rose allegedly made age-based remarks concerning plaintiffs, manifested their displeasure toward Miano during depositions. O:39. Further, Amorelli stated in her affidavit that she did not appreciate being taped without her consent, and expressed regret that she had let her guard down while speaking with Miano during the taped conversation. *See* Plaintiff's Exhibit 25. The issue of Miano's tape recording of conversations with potential witnesses generated considerable controversy, and was the subject of a pre-trial suppression hearing before Magistrate Judge Katz, which was adopted and affirmed by Judge Sand of this Court. *Miano v. AC & R Advertising, Inc.*, 148 F.R.D. 68 (S.D.N.Y.) (Katz, *J.*), *adopted and approved*, 834 F.Supp. 632 (S.D.N.Y.1993) (Sand, *J.*). For purposes of the reinstatement hearing, the taping raises the issue of whether the key personnel at AC & R, including the affiants, would be hostile to plaintiffs, either because of the taping or as the result of their adversarial posture as evidenced by the statements contained in the affidavits. Although the affiants uniformly denied it, the court simply finds their denials to be incredible in every instance. The very suggestion that they could resume their prior, close working relationship with plaintiffs as before, and with Miano in particular, is at war with their numerous assertions that they considered the nonconsensual taping to be deceitful and unethical. Moreover, the court had the opportunity to observe the affiants at the reinstatement hearing and in each case found the expression of those witnesses of their general disavowal of hostility toward each of the plaintiffs to be less than persuasive.

As to Koenig in particular, although he denied that the undisclosed taping on the part of Miano and Widener would cause him to be hostile to plaintiffs upon their return to work, (S:529) the court discredits his denial and accepts the contrary testimony of King. Importantly, when Koenig conducted a personnel interview in connection with King's termination, Koenig angrily asked King if he was recording the conversation secretly. When King answered in the negative, Koenig replied with words to the effect of, "that's good because it would have been illegal since we were in California and that [King] wouldn't be able to get away with what Lou Miano got away with in New York". O:246–250.

Plaintiffs were distressed to learn of the contents of the affidavits, and were understandably alarmed about the unlikely prospects for a workable employment relationship once they set foot on the premises of AC & R. It bears repetition that plaintiffs could not function at AC & R as they had before without dealing with the affiants, several of whom were account executives for major accounts; there simply was no way to work in isolation from them. Plaintiffs were further chilled by the fact that the affidavits were served upon them during the pendency of the offer of reinstatement. They communicated these concerns to AC & R through counsel. Plaintiff's Exhibit 8, 9. A series of letters followed in which defendant never addressed the contents of the affidavits and the effect they were likely to have upon plaintiffs' employment relationship with the affiants. Thereupon, defendant set September 13, 1991 as the final deadline for plaintiffs to accept the offers. Defendant's Exhibit A8, A9.

Plaintiffs were forced to consider not only the impact that the affidavits would have upon their relationship with the affiants, but the added complication of what their return would mean for the two men who had replaced them, Robbie Goolrick and Randy Novick. The court will address each case in turn.

First, it is plain that Goolrick would have deeply resented Miano's return as the Director of Creative Services. Although he denied that any such feelings would exist on his part, the balance of the evidence inevitably leads to the contrary conclusion. Goolrick himself testified that he was irritated because Chereskin had been unwilling to announce officially that Goolrick was the Director of Creative Services and had chosen to treat Goolrick as the Acting Director. Although Goolrick was, in fact, Director, as evidenced by Chereskin's approval of business cards bearing that title under Goolrick's

name, Chereskin refused to announce this fact publicly. Moreover, Goolrick had desired the position when it was held by Miano and had to compete with Cohn for it after Rose fired Miano. O:551–57. As Cohn explained, "it was pretty clear to everyone that this was a shootout." O:551. And Chereskin testified at trial that Miano would have "bumped" Goolrick as the top creative person at the agency if he had returned. S:66. In view of the foregoing, Goolrick's statement that he would have met Miano's return with equanimity asks too much of the court's credulity. Additionally, although Goolrick testified that he had determined privately to leave AC & R prior to the making of the offers of reinstatement, that fact is of no help to AC & R. Assuming, *arguendo,* the truth of Goolrick's statement, plaintiffs had not been made aware of that decision when the offers of reinstatement were made. Additionally, Goolrick remained at AC & R until November 15, 1991, and would therefore have been subordinate to Miano for several months, i.e., assuming Miano had returned and had been given a meaningful role in the department. Even if Goolrick truly had made up his mind to leave, the evidence and plain common sense compel the conclusion that he would have hated the notion of Miano's return like poison itself, and Miano was certainly entitled to expect that that would be the case upon his return.[14]

The court reaches the same conclusion as to Randy Novick. Like Goolrick, he would necessarily have been replaced if Widener were to return as Media Director. S:68. Upon first learning of the offers of reinstatement in the advertising press, Novick was concerned about how such an offer would impact him personally and approached Koenig for details.[15] Koenig did not elaborate

any further than to say that he had decided that the offer was a good way to resolve the situation generally. S:887. Although Novick denied that Widener's return would generate any hostility or concern on his part, S:861; 890, the court cannot credit Novick's denial for much the same reason that it rejected Goolrick's similar protestations. Even assuming that Novick's salary were left intact, and assuming further that Chereskin were to confer a higher officer title upon him as a sort of consolation prize, it would be the height of Panglossian optimism to expect that Novick, or the personnel loyal to him, would be indifferent to Widener's return. Novick would have (understandably) resented his displacement as the head of the Media Department, leading to friction, animosity and distrust between him and Widener. And as was the case with Goolrick, if AC & R had both removed Novick as the Media Director and cut his salary, Novick testified that he would have immediately sought another position. S:891–2.

Plaintiffs did not accept AC & R's offers of reinstatement by the deadline of September 13, 1991. On September 17, 1991 defendant stated through its counsel that it considered the offers of reinstatement rejected. Defendant's Exhibit A14.

## DISCUSSION

■ In cases arising under the ADEA, "the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of [the Act]." 29 U.S.C. § 626(b). Such remedies include reinstatement to the formerly held position, back pay, and in circumstances where reinstatement is found to be an inadvisable remedy, front pay.

---

**14.** Goolrick further admitted that a decrease in his salary along with a demotion would have resulted in his departure from the agency; if he was already contemplating resignation, such a departure presumably would have been much more immediate than it turned out to be. S:850–51.

**15.** Koenig testified at trial that Goolrick and Novick each came to see him immediately upon learning of the reinstatement offers. Novick actually approached Koenig with the article announcing the reinstatement offers in his hand.

S:572; Plaintiff's Exhibit 28. Koenig acknowledged having previously testified that both men expressed their concern over the possibility that plaintiffs might return to the agency, but stated at trial, "[d]uring my deposition, that's what I felt, that's what I thought. Since then, I have heard from various sources somewhere that they weren't concerned." S:568, 11. 9–23. The credible evidence establishes, however, that Goolrick and Novick were quite concerned about how reinstatement would affect them, and wanted details from Koenig.

220

In *Ford Motor Company v. EEOC,* 458
U.S. 219, 241, 102 S.Ct. 3057, 3070, 73
L.Ed.2d 721 (1982), the Supreme Court held
that an employer sued for discrimination in
hiring under the Civil Rights Act of 1964 can
toll the accrual of back pay under section
706(g) of Title VII by unconditionally offer-
ing the plaintiff the job which he had been
denied. The holding in *Ford Motor Compa-
ny* made it plain that the preferred means
for achieving an end to employment discrimi-
nation is to place the claimant in the position
previously denied, through the statutorily ex-
pressed method of "voluntary compliance" if
possible:

> To accomplish this objective, the legal
> rules fashioned to implement Title VII
> should be designed, consistent with other
> Title VII policies, to encourage Title VII
> defendants promptly to make curative, un-
> conditional job offers to Title VII claim-
> ants, thereby bringing defendants into
> "voluntary compliance" and ending dis-
> crimination far more quickly than could
> litigation proceeding at its often ponderous
> pace.

458 U.S. at 228, 102 S.Ct. at 3063. The
Court in *Ford Motor Company* also found
that a policy of requiring claimants to accept
an employer's unconditional offer of the same
or a substantially equivalent position served
the goal of making victims of discrimination
whole, and was in harmony with the statuto-
ry duty contained in section 706(g) to miti-
gate damages. *See id.* at 230–32, 102 S.Ct.
at 3064–65. Thus, the Supreme Court con-
cluded that, "absent special circumstances,
the simple rule that the ongoing accrual of
back pay liability is tolled when a Title VII
claimant rejects the job he originally sought
comports with Title VII's policy of making

discrimination victims whole." *Id.* at 238–39,
102 S.Ct. at 3069.[16]

■■■ The rule in *Ford Motor Company*
is applicable to actions arising under the
ADEA, and governs the availability of front
pay as well as back pay. *Dominic v. Consol-
idated Edison Co. of New York, Inc.,* 822
F.2d 1249, 1258 (2d Cir.1987). The rule ap-
plies in actions where the plaintiff was dis-
charged from his position, as well as in
claims based upon a failure to hire. *See
Giandonato v. Sybron Corp.,* 804 F.2d 120,
125 (10th Cir.1986). The burden of proof as
to whether unconditional offers of reinstate-
ment were made is on the defendant. *See
Dominic, supra,* 822 F.2d at 1258.

The ultimate issue here, consequently, is
whether plaintiffs' rejection of AC & R's
offer of reinstatement tolled the accrual of
back pay and precluded the possibility of an
award of front pay from the date of judg-
ment.[17] Plaintiffs argue that their right to
damages was not affected by *Ford Motor
Company* in this case, and raise the following
contentions: (1) the offers did not uncondi-
tionally offer plaintiffs positions substantially
equivalent to the ones from which they had
been dismissed; (2) the offers were not actu-
ally rejected; (3) the offers were not *bona
fide;* and (4) special circumstances within the
meaning of *Ford Motor Company* existed
such that plaintiffs reasonably refused the
offers without forfeiting their eligibility for
continuing back pay and front pay. The
court addresses each of these issues in turn.

*I.*

A.

■■■ An offer of reinstatement will only
operate under *Ford Motor Company* to toll
the accrual of potential back pay damages if

---

**16.** The Court in *Ford Motor Company* left it to
the trial court to decide what circumstances
would justify a reasonable person's decision to
reject an offer of reinstatement: "If, for example,
the claimant has been forced to move a great
distance to find a replacement job, a rejection of
the employer's offer might reflect the costs of
relocation more than a judgment that the re-
placement job was superior, all things consid-
ered, to the defendant's job. In exceptional cir-
cumstances, the trial court, in the exercise of its
sound discretion, could give weight to such fac-

tors when deciding whether back pay damages
accrued after the rejection of an employer's offer
should be awarded to the claimant." 458 U.S. at
238–239, n. 27, 102 S.Ct. at 3069, n. 27. Among
other circumstances whereby a reasonable per-
son may justifiably reject an offer of reinstate-
ment without forfeiting his remedies would be
hostility on the part of the defendant employer,
discussed more fully in Section IV, *infra.*

**17.** Plaintiffs have not sought the remedy of rein-
statement in the event they prevail on the merits.

the offer is unconditional. 458 U.S. at 238–39, 102 S.Ct. at 3069. According to the rule in *Ford Motor Company,* an offer of reinstatement is understood to be unconditional where the discharged employee is not required to compromise his claims against the defendant as a prerequisite to returning to work. *See id.* at 232 & n. 18, 102 S.Ct. at 3065 & n. 18.

■ Here, the reinstatement letters recited: "[i]n particular, the offer is in no way contingent or dependent upon Mr. [Name] dismissing or compromising his current lawsuit against AC & R." Defendant's Exhibits A1, A2 & A3. Plaintiffs cannot identify evidence of any facts known to them at the time they rejected the offers whereby they could reasonably conclude that the offers were, in fact, conditioned on the abandonment of their legal claims against AC & R. Consequently, AC & R has met its burden on this point.

### B.

■ Furthermore, the court is satisfied that the positions to which plaintiffs were offered reinstatement were identical to the ones from which they had been fired. It bears repetition that AC & R was not obligated to go even that far; rather, an offer of reinstatement is effective under *Ford Motor Company* as long as the employer offers the claimant a position that is "substantially equivalent" to the job from which he was fired (or to which the defendant failed to hire him).[18]

Initially, plaintiffs were entitled to question the nature of the positions to which AC & R proposed to reinstate them. For example, the letter of August 7, 1991 in the *Miano* action specified that Miano would be reinstated to the position of "Vice Chairman, Creative Director", rather than "Vice Chairman, Director of Creative Services". The title "Creative Director", however, was a job description corresponding to a subordinate member of Miano's department, e.g., Gool-

rick and Cohn. Similarly the offer of reinstatement in the *Widener* action specified the title of "Media Director", but did not recite Widener's officer title of "Senior Vice President", and the offer to Weinstein neglected to mention his title of "Executive Vice President". Nor did the reinstatement letters specify whether plaintiffs would regain their positions on the various management committees to which they had belonged during their previous tenure at AC & R, or address their role, if any, in a management buyout. Plaintiffs questioned whether they would have been placed in the same positions they had held prior to termination. Defendant's Exhibit A6 at 2. Plaintiffs received the following clarification:

> Your clients will be put in the identical positions they held prior to their termination. They will have the same status, job responsibilities, and working conditions.

Defendant's Exhibit A7 at page 2, paragraph 2. Thus, there can be no question that the offer was of "substantially equivalent" positions; in fact, it was an offer of the identical position from which plaintiffs had been discharged.

Plaintiffs raise several additional contentions in this area. First, plaintiffs point out that the reinstatement letters do not offer fringe benefits equivalent to those the plaintiffs had had prior to termination but offer instead fringe benefits equal to those of executives on their level. Second, plaintiffs urge that a sharp decline in billings and staffing, combined with political infighting and changes in the reporting structure, had so transformed AC & R that the positions that plaintiffs had been offered could not seriously be considered identical to or even "substantially equivalent" to their previous jobs. Closely related to this latter point is the fact that AC & R was the subject of proposed buyouts and possible auction to an outside agency.[19]

---

18. "Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." 458 U.S. at 231–32, 102 S.Ct. at 3065

(footnotes omitted). *See also Reilly v. Cisneros,* 835 F.Supp. 96, 101–02 (W.D.N.Y.1993).

19. AC & R experienced a contraction in billings on the order of $100,000,000 between 1990 and 1991, and lost several clients. O:242–44. Fol-

Defendant replies that the remedial provisions of the federal anti-discrimination laws do not require employers to insure claimants against a decline in the business fortunes of a defendant company. The court agrees with AC & R. Indeed, all AC & R was required to do in order to invoke *Ford Motor Company* was to offer plaintiffs substantially equivalent positions to the ones plaintiffs had occupied at AC & R prior to termination. Although defendant lost a number of accounts and experienced significant personnel changes following the termination of plaintiffs, there is no evidence that plaintiffs' duties upon returning to AC & R would have been in any way different from what they had been before termination. Most of the same accounts over which plaintiffs had exercised oversight and supervision remained at AC & R. Thus, the positions offered by AC & R to plaintiffs were no less substantially equivalent to the positions held by plaintiffs before termination.[20]

Moreover, expansions and contractions are common to many companies and would have occurred at AC & R even if plaintiffs had not been terminated. *Ford Motor Company* plainly rejects the notion that plaintiffs are entitled to be placed in a better position than they would have been in the absence of discrimination. 458 U.S. at 234, 102 S.Ct. at 3066 (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–22, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280 (1975)) (purpose of Title VII is to make persons whole for injuries suffered due to unlawful discrimination). Indeed, had AC & R gone out of business, plaintiffs' eligibility for back pay might have ended upon the sale. *See, e.g., EEOC v. Monarch Machine Tool Co.,* 737 F.2d 1444, 1453 (6th Cir.1980) (where employer sells business and terminates all employees, plaintiff's right to back pay ends

upon the date of sale); *Slack v. Havens,* 522 F.2d 1091, 1095 (9th Cir.1975) (same, unless successor company arises out of sale). *But see Gaddy v. Abex Corp.,* 884 F.2d 312, 319 (7th Cir.1989) (back pay after date of sale not foreclosed where evidence shows that, but for discriminatory discharge, plaintiff still would have been employed). It follows, therefore, that AC & R is not precluded from invoking *Ford Motor Company* merely because plaintiffs would have returned to a changed company.

## II.

Plaintiffs argue that, even if AC & R unconditionally offered them positions substantially equivalent to those from which they had been discharged, the offers were never rejected. Defendant responds that the deadline to accept the offer was extended repeatedly, ultimately to the point where plaintiffs had approximately six weeks to consider the offers. Plaintiffs corresponded with defendant through counsel in the interim, seeking clarification of the substance of the offers, and received replies accordingly. Under the circumstances, AC & R was entitled to deem the offers rejected when plaintiffs did not seasonably accept them.

## III.

Plaintiffs next advance the theory that the offers of reinstatement were nevertheless void *ab initio* because they were not *bona fide.* In essence, plaintiffs urge that when offers of reinstatement are proved to be tainted by bad faith on the part of the employer, *Ford Motor Company* does not even come into play: defendant fails in its burden of proof and the full range of remedies under the ADEA remains unaffected by the reinstatement offers.[21] Thus, if it were found the

---

lowing layoffs in 1991, AC & R employed approximately 180 people, down from 300 in 1990. S:378; Plaintiffs' Exhibit 37.

**20.** Nor would the reduction in billings and personnel in this case constitute such special circumstances as would justify a reasonable claimant's decision to reject an offer of reinstatement. AC & R's downsizing is not a factor upon which the court bases its decision.

**21.** Plaintiffs held this position throughout the trial and in their post-trial submissions. Plaintiffs' Post–Trial Memorandum at 53–72. Defendant did not directly confront this reading of *Ford Motor Company* at any point, except to state that allegations of bad faith were unsupported by the record. Closing Arguments, O:1125. Defendant takes the position generally that the court is bound to consider only facts known to plaintiffs at the time they rejected the offer; thus, if plaintiffs did not then have facts that would validate

reinstatement offers were made in bad faith, the court would not need to reach the issue of whether plaintiffs were justified in rejecting them. For this proposition, plaintiffs rely upon two decisions of the Eleventh Circuit, *Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277 (11th Cir.1992) and *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290 (11th Cir.1989).

The court in *Stanfield* did suggest that, as a prerequisite to *Ford Motor Company*'s tolling rule, an offer of reinstatement must be made in good faith. "[I]t is consistent with the Act to encourage employers to make good-faith offers to claimants. Once such an offer is made, claimants forfeit their right to reinstatement [or front pay] unless their refusal of the employer's offer is reasonable." 867 F.2d at 1296. Citing *Stanfield*, the court in *Lewis* decided that the plaintiff's rejection of an offer of reinstatement was reasonable under *Ford Motor Company*, but the court did so only after first satisfying itself as a threshold matter that the trial court's "implicit" finding of good faith was amply supported by the record. *Lewis*, 953 F.2d at 1279. Close examination of the decision in *Lewis* suggests that if the trier of fact were to have found that the warden's offer of reinstatement to Lewis was made in bad faith, the defendant prison authority's right to invoke *Ford Motor Company*'s tolling rule would have died right there, without any further inquiry into the reasonableness of the plaintiff's decision not to return to work. *See id.* *Accord, Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808–09 (8th Cir. 1982) (summary judgment in favor of employer proper where plaintiff failed to present evidence that offer of reinstatement was not *bona fide*). *See also Real v. Continental Group, Inc.*, 627 F.Supp. 434, 447 (N.D.Cal. 1986) (evidence supported jury determination that reinstatement offer made in good faith even though timing of offer could equally support inference of bad faith); *Donovan v. Commercial Sewing, Inc.*, 562 F.Supp. 548, 554–55 (D.Conn.1982) (because offer of reinstatement not tendered in good faith, but motivated by nothing other than the desire to

toll the accrual of back pay, offer could not be relied upon to invoke *Ford Motor Company* tolling rule). The above cited cases do not, however, make it clear whether the *bona fides* of the offer is to be considered in the context of the defendant's initial burden of proof under *Ford Motor Company*, or whether the issue of good faith should only be addressed when deciding whether a plaintiff justifiably rejected such an offer. That distinction is particularly important where, as here, the facts proving such bad faith were not known to plaintiffs at the time they rejected the offers of reinstatement, but were instead revealed during the litigation.

Plaintiffs raise a host of facts and circumstances from which to draw an inference of bad faith. Plaintiffs' Post–Trial Memorandum at 53–72. Several of those issues are relevant to the issue of whether plaintiffs reasonably rejected the reinstatement offers. As to the issue of whether the reinstatement offers are voided by AC & R's bad faith, however, the court is principally concerned with Koenig's statement to King that plaintiffs would be isolated and would not be allowed to perform any function upon returning to AC & R.

Plaintiffs' argument has some appeal. Certainly, this court cannot imagine that a principled application of the tolling rule in *Ford Motor Company* should reward an employer by allowing him to take advantage of that rule simply by attempting a bogus offer of reinstatement as a litigation tactic, i.e., for the sole purpose of cutting off a claimant's right to back pay and precluding later reinstatement or front pay. *See Donovan*, 562 F.Supp. at 555. Such a scheme would hardly advance the goal of bringing defendants into voluntary compliance with the ADEA.

However, the Court in *Ford Motor Company* also grounded its rule governing back pay upon the statutory duty of claimants to mitigate their damages. 458 U.S. at 231, 102 S.Ct. at 3065. In this vein, courts have held that the proper test of whether a plaintiff is justified in rejecting an offer of reinstate-

---

their refusal, they were bound to accept the offer and wait to see what happened. Nevertheless, since there is evidence (albeit, after-acquired evidence) to cast doubt on the *bona fides* of the reinstatement offer, the court reaches plaintiffs' argument.

ment is an objective one, examining whether a reasonable person in the claimant's position would decline the offer. *Morris v. American Nat. Can Corp.*, 952 F.2d 200, 203 (8th Cir. 1991) (citing *Fiedler, supra,* 670 F.2d at 808). Hence, the trial court in *Real* held that the question of whether the offer was *bona fide* merges with the issue of whether it was reasonably rejected. 627 F.Supp. at 447. Certainly that view would not present a problem where the bad faith of the offer was known to the claimant or reasonably could be inferred from the circumstances of the offer (as it was in *Donovan* ); the employee would prevail in either event. However, *Real* did not involve evidence of bad faith acquired after the plaintiff refused reinstatement.

▇▇▇ The court need not resolve this issue here. Since the record in the instant case contains abundant evidence from which to conclude that plaintiffs reasonably rejected AC & R's offer of reinstatement, the issue of whether evidence acquired after the rejection of a reinstatement offer may render that offer void as a matter of law,. and preclude the operation of *Ford Motor Company* altogether, may be left for another day.

### IV.

▇▇▇ The pivotal issue here is whether plaintiffs justifiably rejected the offers of reinstatement made to them by AC & R. The court recognizes the strong preference for reinstatement as the remedy for future lost earnings in discrimination cases. *Maxfield v. Sinclair Intern.*, 766 F.2d 788, 796 (3rd Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir.1984). "Nonetheless, although the law encourages claimants to accept offers of reinstatement, it does not, in every circumstance, *require* them to do so...." *Lewis v. Federal Prison Industries, Inc.*, 953 F.2d at 1279 (emphasis in original). While the issue of whether reinstatement is appro-

priate is typically addressed by the court after a finding ·of liability, it is also relevant in cases such as this one, where the employer has offered reinstatement during the course of the litigation and the employee has refused. *Ford Motor Company* established that, under certain circumstances, a plaintiff may justifiably reject an offer of reinstatement during the litigation. If the employer meets its initial burden under *Ford Motor Company,* the employee must then come forward with proof that his decision to decline reinstatement was justified; if the plaintiff can adduce such proof, he does not forfeit the right to back pay and other relief accruing after the date he rejected the offer. 458 U.S. at 238 & n. 27, 102 S.Ct. at 3069 & n. 27. The determination as to what factors will justify such a refusal is left to the sound discretion of the trial court. *Id.*

▇▇▇ As stated, whether a discrimination plaintiff was justified in rejecting an offer of reinstatement during the litigation is measured according to an objective standard, i.e., whether a reasonable person in plaintiffs' position would refuse the offer. *Morris v. American Nat. Can Corp.*, 952 F.2d 200, 203 (8th Cir.1991); *Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808 (8th Cir.1982). The court measures the reasonableness of the plaintiff's decision based upon the facts that were known by the plaintiff at the time he made the decision. *Bragalone v. Kona Coast Resort Joint Venture*, 866 F.Supp. 1285, 1297 (D.Hawaii 1994). The court considers "the circumstances under which the offer was made or rejected, including the terms of the offer and the reasons for refusal." *Claiborne v. Illinois Central Railroad,* 583 F.2d 143, 153 (5th Cir.1978), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979).

Reinstatement has been found to be unworkable in cases where antagonism between the parties was so great as to make alternative relief preferable.[22] *See, e.g., Lewis,* 953

---

**22.** Defendant takes the position that cases in which courts have found reinstatement to be an unworkable remedy· *after* a finding of liability are inapposite to the instant case, where plaintiffs, rather than a court, were obliged to make a judgment (albeit at a different stage of the litiga-

tion) as to whether the prospect of reinstatement was reasonably feasible. Defendant's Post–Trial Reply Memorandum at 9–11; Closing Arguments of Gerald S. Hartman, Esq., O:1113–14. Defendant's argument is simply not persuasive. Inasmuch as the court is required to revisit plaintiffs'

F.2d at 1280 (employee reasonably declined reinstatement due to medical impact of unremitting hostility from employer); *E.E.O.C. v. Prudential Federal Savings and Loan Association*, 763 F.2d 1166, 1172–73 (10th Cir. 1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1986); *Cancellier v. Federated Department Stores*, 672 F.2d 1312, 1319 (9th Cir.1982), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982) (defendant's repeated attacks on plaintiffs' ability during litigation and description of one plaintiff as a "cancer" made productive business relationship impossible and reinstatement denied); *Maturo v. Nat'l Graphics*, 722 F.Supp. 916, 927 (D.Conn.1989) (plaintiff reasonably declined reinstatement where contact at work with prior supervisor who harassed her was inevitable and defendant failed adequately to ensure that it would shield plaintiff from future harassment).

■ The Second Circuit has recognized that deterioration of the relationship between the parties caused by the litigation may persuade a court that reinstatement is unrealistic. *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728–29 (2d Cir.1984) (employer exhibited "such hostility and outrage" against employee due to ADEA suit and was likely to ostracize employee thereby preventing him from meaningfully functioning in company). That is not to say that reinstatement is impossible whenever friction arises in a litigation. Preclusion of reinstatement due to such tensions that are the "natural bi-product of any litigation" would be incompatible with the remedial scheme of the anti-discrimination laws. *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1138–39 (8th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981).

Throughout these proceedings, defendant scornfully dismissed plaintiffs' expressed concern that tension, suspicion and outright antagonism would greet them upon their return to AC & R, as a result not only of the prior and ongoing litigation but pre-existing hostility as well. Defendant urges that whatever

decision to determine whether it was objectively reasonable in light of alleged antagonism in the workplace, it is engaged in the same exercise as it would be if it were considering whether to impose reinstatement as an equitable remedy

discomfort might exist would be unremarkable and compares the instant case to others in which courts found reinstatement appropriate, notwithstanding egregious acts of harassment. In *Morris v. American National Can Corporation*, 730 F.Supp. 1489, 1490–94 (E.D.Mo.1989), *aff'd in part, reversed in part*, 952 F.2d 200 (8th Cir.1991), the plaintiff was the target of numerous and sordid acts of sexual harassment, involving the repeated, anonymous delivery of phallic symbols and messages to her work station that mocked her personally and suggested that she was sexually promiscuous. Six months after Morris' constructive discharge, American Can made an unconditional offer of reinstatement, which Morris rejected because she did not believe assurances that American Can would protect her from further acts of sexual harassment. She subsequently accepted the offer, however, and returned to work within a year of her discharge, while the litigation was pending. The district court in *Morris* found that defendants were liable for unlawful sexual harassment in violation of Title VII, but held that back pay was tolled by the offer of reinstatement. 730 F.Supp. at 1497.

The published decision of the district court in *Morris* does not reveal its findings concerning the reasonableness of the plaintiff's apprehension and her initial decision not to return to American Can. The court of appeals, nevertheless, observed as follows:

We have reviewed the correspondence between American Can and Morris regarding the terms of her reinstatement, as well as the testimony of company representatives and we are satisfied that this evidence shows that American Can was sincere in its claim that it was prepared to protect Morris from any further sexual harassment. We also view Morris's ultimate return to her position as evidence that the *company was prepared to protect Morris from any further sexual harassment*. Although we may have viewed the evidence

after a finding of liability. Surely the same considerations will inform the court's judgment. *See, e.g., Lewis*, 953 F.2d at 1280 and cases there cited.

differently, we cannot conclude that the district court clearly erred in tolling American Can's offer of back pay on September 8, 1987. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985)

*Morris,* 952 F.2d at 203.

Similarly, AC & R relies on *Bragalone v. Kona Coast Resort Joint Venture*, 866 F.Supp. 1285 (D.Hawaii 1994). In *Bragalone*, the plaintiff was a housekeeper at a Hawaii resort. Bragalone alleged that she was passed over for promotion due to her age and later terminated in retaliation for her commencement of legal proceedings. Bragalone was subsequently offered reinstatement, but refused.

The district court entered partial summary judgment in favor of the resort, holding that Bragalone's refusal to accept reinstatement tolled the accrual of back pay. That court noted that her immediate supervisor had received a written disciplinary action from the president of the company and was instructed to welcome the plaintiff back to the workplace. 866 F.Supp. at 1290. The district court recognized that the work environment at the resort had been stressful, but found that the level of hostility described did not, if proved, rise to such a level as would justify a refusal of reinstatement. *Id.* at 1296. Since the plaintiff did not present evidence to create a triable issue concerning the sufficiency of the defendant's assurances to her, the district court found summary judgment was appropriate.

The instant case is plainly distinguishable from *Morris* and *Bragalone*. In those cases, the evidence demonstrated that the plaintiffs there unreasonably failed to accept the assurances of their respective employers that they would be protected from harassment or retaliation on the part of former supervisors and associates upon their return to work. Here, however, plaintiffs reasonably anticipated that no such safeguards would exist, notwithstanding the statements made to them in the correspondence between counsel.

Significantly, plaintiffs would be directly subject to a Chief Operating Officer whose previous antagonistic dealings with plaintiffs have been fully described, *supra.* Koenig had already made it clear how he felt about employees, like Weinstein, who sought to complain about his actions. Miano, in particular, had ample reason to be apprehensive about working under Koenig's leadership. If Miano were to return to AC & R and maintain his litigation, it would be necessary to testify in detail, as he ultimately did, concerning Koenig's initial role in the lawsuit, while still working under Koenig. Moreover, in August 1991 Koenig's position at AC & R was higher on the organizational chart than before the termination of plaintiffs (Plaintiffs' Exhibit 64) and his influence had correspondingly increased. Indeed, the only official check on his actions was Chereskin, a CEO who had demonstrated little interest in management and had delegated much of his responsibilities (including the conduct of the instant litigation) to Koenig. Therefore, it is of little significance that Miano and Weinstein would have reported on paper to Chereskin.

Additionally, upon returning to work, plaintiffs' closest associates would have been the same people who had submitted sworn statements in support of AC & R's original decision to terminate plaintiffs. The affidavits speak entirely for themselves. Although defendant argues that they are "the normal bi-product of any litigation" *Taylor, supra,* 648 F.2d at 1138–39, plaintiffs certainly could not make a rational decision concerning the offers of reinstatement without considering the affidavits, which were delivered to them before AC & R's deadline for accepting the offers.[23] Considering the affiants' averments, the court agrees with plaintiffs that it would be problematic at best on a given workday to sit in an office with one of the affiants in the morning to develop a client

---

23. Defendant seeks to discount the impact of the affidavits. First, defendant argues that they were merely delivered in response to a document production request during the litigation. Second, defendant points to several statements contained in the affidavits, particularly those relating to the

*Weinstein* action, which are somewhat complimentary to plaintiffs, and Weinstein in particular. Be this as it may, the only relevant consideration here is what the affidavits actually say, and how their derogatory contents would impact upon a reasonable person in plaintiffs' position.

presentation, only to depose the affiant in the afternoon.

Moreover, there is the fact that, if Miano were to return as Director of Creative Services and Widener were reinstated as Media Director, the men who had replaced them in those positions would have to be "bumped". It makes little difference that Goolrick was treated as an "Acting Director"; in his mind, and for all intents and purposes, he was the sole head of Miano's old department. As the court has already observed, Miano and Widener did not have to be psychologists to know that Goolrick and Novick would bitterly resent their return. Contrary to defendant's assertions, these are not merely the subjective fears of plaintiffs, or the product of "rank speculation"; they are what a reasonable person in plaintiffs' respective positions would conclude based upon their prior history at AC & R, the facts known to them in August and September of 1991, and ordinary common sense.

Plaintiffs rely upon several discrimination cases in which, following a finding of liability, courts declined to order reinstatement as an equitable remedy because the close working relationship between the plaintiffs in those actions and their coworkers had been destroyed by the litigation. For example, in *E.E.O.C. v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919 (S.D.N.Y.1976), *aff'd without opinion,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977), the court declined to order reinstatement in view of the need for a close working relationship between the plaintiff and the top executives—a relationship which the court found to be impossible. There the court stated, in relevant part:

> This litigation has been marked by more than the usual hostility between the parties.... [I]n this case, the job from which plaintiff was discharged required a close working relationship between plaintiff and top executives of defendant. It also involved frequent personal contact with defendant's clients, with plaintiff acting as defendant's representative. Lack of complete trust and confidence between plaintiff and defendant could lead to misunderstandings, misrepresentations and mistakes, and could seriously damage defendant's relationship with its clients.

*Kallir, Philips,* 420 F.Supp. at 926–27. *See also Combes v. Griffin Television, Inc.,* 421 F.Supp. 841, 846 (W.D.Okla.1976) (sensitive position of anchorman made reinstatement impracticable in view of hostility from station management and the anticipated perception of same by the viewing audience).

*Kallir, Philips* and *Combes* were both decided before *Ford Motor Company.* Nevertheless, the same considerations that led the court in those cases to deny the equitable remedy of reinstatement are relevant when deciding, under *Ford Motor Company,* whether the instant plaintiffs reasonably determined that they could not realistically function in a similar environment, such as the one that existed at AC & R in August 1991.

This court holds that exceptional circumstances existed whereby plaintiffs reasonably concluded their return to AC & R would be greeted by suspicion and antagonism, notwithstanding reassurances to the contrary. The short of the matter is: even taking the reinstatement offers at face value, plaintiffs were aware that the work environment to which they were invited to return would have been one of serious discord and suspicion in a business where trust and open communication were essential. Plaintiffs knew, both from their prior dealings and from their experiences during the litigation, that there was no way to function in their old jobs in isolation from Koenig, Novick, Goolrick and all the other affiants, and no way realistically to function with those people as co-workers, much less with any peace of mind. Miano and Widener would have faced resistance from their former subordinates, and Weinstein would have had to fight to regain jurisdiction over accounts that were no longer managed by a Director of Marketing and Research after his termination. Finally, it would have been difficult, to say the least, to command the respect and confidence of clients who had come to rely on an agency that did not employ plaintiffs for many months. In view of the facts existing in September 1991, plaintiffs' apprehension was more than justified, and could not be expected to disappear based on the anodyne reassurance that "no aura of hostility exists", or the talismanic recital that defendant's employees would be instructed to work with plaintiffs as before.

228

## CONCLUSION

The court does not hold that an employee in a position of trust and confidence, working closely with senior management or other employees who might be drawn into a litigation, can never as a matter of law be reinstated to employment, either during or following a litigation. Rather, the court holds that, in light of *Ford Motor Company* and its progeny, and under all the facts and circumstances, *these* executives could not have returned to work with the management of the defendant here, based on their prior relationship and the conduct of the instant litigation. Consequently, the court holds that the accrual of back pay was not tolled by plaintiffs' refusal of AC & R's offer of reinstatement, and plaintiffs' eligibility for front pay is similarly unaffected.

IT IS SO ORDERED.